Slip Op. 17 - 160

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SHENZHEN XINBODA INDUSTRIAL CO. LTD., QINGDA6O TIANTAIXING FOODS, CO., SHENZHEN BAINONG CO., LTD., SHENZHEN YUTING FOODSTUFF CO., LTD., JINXIANG HEJIA CO., LTD., JINXIANG FEITENG IMPORT & EXPORT CO., LTD., | Before:<br>R. Kenton Musgrave, Senior Judge<br>Consol. Court No. 16-00116 |
| Plaintiffs, | **PUBLIC VERSION** |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| FRESH GARLIC PRODUCERS ASSOCIATION, *et al.*, | |
| Defendant-Intervenors. | |

## OPINION

[Remanding 20th administrative review of fresh garlic from the People's Republic of China on issue of rejected economic comparability information and sustaining final results for one mandatory respondent.]

Dated: December 5, 2017

*Gregory S. Menegaz*, *J. Kevin Horgan*, *John J. Kenkel*, *Judith L, Holdsworth*, and *Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, DC, for the plaintiffs Shenzhen Xinboda Industrial Co., Ltd., Shenzhen Bainong Co., Ltd., Shenzhen Yuting Foodstuff Co., Ltd., Jinxiang Hejia Co., Ltd., and Jinxiang Feiteng Import & Export Co., Ltd.

*Robert T. Hume*, Hume & Associates LLC, of Taos, NM, for the plaintiff Qingdao Tiantaixing Foods Co., Ltd.

*Emma E. Bond*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant.  On the brief were *Chad E. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of Counsel was *Emily Beline*, Attorney, Office of the Chief Counsel for Enforcement and Compliance, U.S. Department of Commerce.

*Michael J. Coursey*, *John M. Herrmann*, and *Joshua R. Morey*, Kelley Drye & Warren, of Washington, DC, for the defendant-intervenors.

Musgrave, Senior Judge:  This opinion addresses three consolidated challenges to the final antidumping ("AD") duty administrative review[1] *Fresh Garlic from the People's Republic of China*[2], 81 Fed. Reg. 39897 (June 20, 2016) ("20th AR Final Results"), PDoc 442, as explained by the International Trade Administration, U.S. Department of Commerce ("Commerce"), in its issues and decision memorandum ("*IDM*") accompanying that public notice, PDoc 439.   The period of review ("POR")[3] is November 1, 2013, through October 31, 2014,and the pertinent plaintiffs here are Shenzhen Xinboda Industrial Co., Ltd. ("Xinboda") and Qingdao Tiantaixing Foods, Co. ("QTF").  Together with the others,[4] they challenge Commerce's: (1) rejection of factual information

---

[1]  *See* Tariff Act of 1930 §751, as amended, 19 U.S.C. §1675.  This is the 20th such review ("AR 20") of the AD duty order thereon. *Cf. Fresh Garlic from the People's Republic of China*, 59 Fed. Reg. 59209 (Nov. 16, 1994).

[2]  Hereinafter "PRC".

[3]  *See Initiation of AD and Countervailing Duty Administrative Reviews*, 79 Fed. Reg. 76956 (Dec. 23, 2014), PDoc 23.

[4]  *Cf.* Plaintiff Shenzhen Xinboda Industrial Co., Ltd.'s Motion for Judgment on the Agency Record ("Xinboda Br.") *with* Memorandum of Law in Support of Co-Plaintiffs Jinxiang Hejia Co., Ltd., Jinxiang Feiteng Import & Export Co., Ltd., Shenzhen Bainong Co., Ltd., and Shenzhen Yuting Foodstuff Co., Ltd.'s Motion for Judgment upon the Agency Record at 9 ("[i]n order not to repeat the arguments being made by the other Plaintiffs in their legal memoranda, co-Plaintiffs Hejia, Feiteng, Bainong, and Yuting join in the arguments made by them and incorporate them herein").

from Xinboda as untimely; (2) selection of Romania as the surrogate country; (3) calculation of

Xinboda's movement expenses; (4) application to QTF of facts otherwise available with an adverse

inference; and (5) disregard of QTF's separate rate information as unreliable and finding that QTF

was part of the PRC-wide entity. For the following reasons, Xinboda persuades that the first issue

requires remand for reconsideration, obviating further discussion here of issues (2) and (3), but

QTC's arguments on (4) and (5) lack persuasiveness.

## I. *Overview*

Commerce initiated the 20th review of the AD order towards the end of December

2014 and initially selected Xinboda and Hebei Golden Bird Trading Co., Ltd. as mandatory

respondents for the POR. PDoc 138 at 4-5. The latter did not respond to its questionnaire; therefore

Commerce added or substituted QTF as a mandatory respondent. PDoc 165 at 1; PDoc 302 at 3.

In its preliminary results,[5] Commerce found the magnitude of dumping for Xinboda's entries to be

$2.72 per kilogram. *See* PDoc 398 at 1; PDoc 399 at 75973. For QTF, Commerce preliminarily

applied adverse facts available, found QTF ineligible for a separate rate, and included QTF in the

PRC-wide entity bearing the AD duty rate of $4.71 per kilogram.[6] After considering the parties'

comments for the final results, Commerce affirmed that Xinboda had dumped subject merchandise

by a margin of $2.75 per kilogram, applied that rate to the separate-rate-eligible respondents, and

affirmed that QTF was ineligible for a separate rate. *See* PDoc 442 at 39898.

---

[5] 80 Fed. Reg. 75972 (Dec. 7, 2015), PDoc 399, and accompanying decision memorandum ("*PDM*"), PDoc 398.

[6] PDoc 398 at 11-14; PDoc 400.

Xinboda and QTF filed timely challenges here to the 20th AR Final Results pursuant to 19 U.S.C. §1516a(a)(2)(A)(i)(I) and (B)(iii) and claim proper jurisdiction under 28 U.S.C. §1584(c).  The standard of judicial review thereon is confined to substantial evidence on the record, *see* 19 U.S.C. §1516a(b)(1)(B)(i), meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion", *i.e.*, "more than a mere scintilla".  *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citation omitted).  This also means that the possibility of drawing inconsistent conclusions from the record "does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).

II.  *Xinboda's Challenges*

Xinboda moves for judgment on the administrative record of Commerce's (1) rejection of its supplemental submission of information pertaining to the Mexican economy as potentially comparable to that of the PRC, (2) selection of Romania as the primary surrogate country, and (3) calculation of movement expenses.  Xinboda Br. at 2-35.

A.  Rejection of Surrogate Country Information

1.  Background

For outstanding AD orders, Commerce annually reviews and determines the margin of dumping, *i.e.*, the difference between export price or constructed export price and "normal" value ("NV").  *See* 19 U.S.C. §1675(a)(1)(B).  NV is to be determined to "a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price".  19 U.S.C. §1677b(a)(1)(A).  When subject merchandise is from a non-market economy ("NME"), Commerce

is required to base NV on the factors of production ("FOPs") for subject merchandise and "utilize, to the extent possible," FOPs in one or more surrogate market economy countries that are economically comparable to the level of economic development of the NME country and significant producers of comparable merchandise. 19 U.S.C. §1677b(c).  *See, e.g.*, *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1292 (Fed. Cir. 2016).   In conjunction with such "to the extent possible" utilization, and with one exception not relevant here, FOPs are to be valued on the basis of the "best available information regarding the values of such factors". 19 U.S.C. §1677b(c)(1)(B). Towards that goal, Commerce tests FOP data on the record for (1) public availability, (2) product specificity, (3) broad market average, (4) tax and duty exclusivity, and (5) contemporaneity.  *See IDM* at 12, citing Policy Bulletin 04.1; *see, e.g.*, *Fresh Garlic Producers Ass'n v. United States*, 39 CIT ___, ___, 83 F. Supp. 3d 1330, 1337 (2015).

　　　　　The administrative preference is to use FOPs from a single "primary" surrogate country.  *See, e.g.*, *Jiaxing Bro. Fastener*, 822 F.3d at 1302, citing 19 C.F.R. § 351.408(c)(2).  The selection of thereof is a four-step process:  First, Commerce requests from its Office of Policy ("OP") a list of countries at a comparable level of economic development to the NME country (the "OP List").  *See id*. at 1293; *see also NME Surrogate Country Selection Process*, Policy Bulletin 04.1 (2004). The policy bulletin explains (at page 2; italics added) that "OP *determines* economic comparability on the basis of per capita gross national income, as reported in the most current annual issue of the *World Development Report*".  Second, Commerce identifies countries on that list with producers of comparable merchandise. *Jiaxing Bro. Fastener*, 822 F.3d at 1302 (citations omitted).  Third, Commerce determines whether any of those countries are "significant producers" of

comparable merchandise.  *Id*.  Fourth, if more than one country remains, Commerce will select the country with the best data for FOP valuation.  *Id*.; *see also* 19 U.S.C. § 1677b.

For the 20th AR, Commerce provided OP's list to interested parties *via* a letter-memorandum approximately four months after initiation.  PDoc 153 (Apr. 20, 2015).  Commerce considers that list "non-exhaustive."  *Id*. (OP List at 1).  The countries that made that list were based on the available 2013 per capita gross national income ("GNI") data from the World Bank,[7] as follows: PRC ($6,560); Romania ($9,060); Bulgaria ($7,360); South Africa ($7,190); Ecuador ($5,760); Thailand ($5,340); and Ukraine ($3,960).  The letter-memorandum accompanying that list also instructed:

> Because it is the Department's practice to determine economic comparability early in a proceeding, we are providing interested parties an opportunity to *comment* on the list as a starting point for surrogate country selection . . . and to *propose* for consideration other countries that are at a level of economic development comparable to the PRC.  These *comments* are due by 5:00 pm Eastern Daylight Time (EDT), April 27, 2015.  Rebuttal comments are due by 5:00 pm EDT, May 4, 2015.

*Id*. at 1 (bolding omitted; italics added).

At the same time, the letter-memorandum stated it was Commerce's "inten[tion] to announce the identification of its surrogate country selection in its preliminary results".  *Id*. at 2.  Towards that goal, and as boilerplated in numerous other NME proceedings, in addition to the above due dates the letter instructed four others: a June 1, 2015 deadline for commenting on surrogate country selection with rebuttal by June 11, 2015; and a June 17, 2015 deadline for publically

---

[7] In this instance, because the 2015 *World Bank Development Report*, published in December 2014, did not contain GNI data, OP relied on the December 16, 2014 revision to 2013 GNI data published in the *World Bank Development* Indicators database.  *See* PDoc 153 (OP List at 2).

available information to value the factors of production for the preliminary results with rebuttal by

June 22, 2015.  *Id.*

Xinboda responded with timely submitted comments on surrogate country selection

and FOP information that argued for India and/or Thailand as economically comparable to the PRC.

PDocs 156, 179.   Xinboda did not at that time prospect Mexico as a country economically

comparable to the PRC, but on September 17, 2015, it submitted "additional" comments along with

2014 GNI data from the World Bank made available in July 2015, together with information on

Mexican garlic production, for the agency's use when selecting the appropriate surrogate country

from the record.  Xinboda contended that the information would establish Mexico as a significant

producer of garlic, and called Commerce's attention to the fact that it had begun using such

information in other trade proceedings, and that its revised list in such proceedings included Mexico

and Thailand, which had not been considered as economically comparable countries at the time OP

prepared its list earlier in this review.  *See* Xinboda Br. at 22 n.4, referencing PDoc 153 at 1.

Eight days later, Commerce rejected that submission as "untimely" and removed it

from the record.  *See* PDoc 318, citing 19 C.F.R. §§ 351.302(d)(1)(i), 351.104(a)(2)(ii)).  *Cf.* PDoc

312 (first page of rejected submission).  Commerce stated that although the submission was filed

before the regulatory deadline for factual information to value FOPs, the submission contained GNI

data relating to economic comparability, and that the "previously established" deadline(s) for filing

such information had already passed.[8]  *See id*. at 1.  Xinboda asked Commerce to reconsider,[9] but

Commerce stood by its rejection in the preliminary results -- issued two months later -- for the same

reasons as stated in its earlier letter to Xinboda.  *PDM* at 16.  *See* PDoc 325 at 1.  For the final

results, Commerce adhered to that decision.  *IDM* at 19-21.

2. Analysis

None of the papers indicates the precise regulatory deadline with which Xinboda's

submission would have been in conflict, as the regulations[10] do not explicitly address "economic

comparability" related to the selection of the primary surrogate country.  *See generally* 19 C.F.R §§

351.102(b)(21) & 351.301.  However, it is at least clear that the GNI data of Xinboda's supplemental

submission were factual in nature, regardless of the exact provision of those regulations that would

cover them, and at the very least the data would have been covered by the apparent "catch-all" of the

---

[8]  Commerce also rejected other Xinboda submissions containing information in support of choosing Mexico as the primary surrogate country.  *See*, *e.g.*, PDoc 319 at 1; PDoc 320 at 1; PDoc 322 at 1; PDoc 323 at 1.

[9]  Xinboda Request to Reconsider (Sep. 30, 2015), PDoc 325. Xinboda here states that therein it laid out the several reasons that constitute good cause to have accepted this information, including Commerce's emphasis on economic comparability, contemporaneity, and Xinboda's inability to have submitted this information at the initial deadline. Xinboda Reply at 8-9. The defendant disputes that Xinboda argued good cause, but the record appears to support Xinboda's characterization.

[10]  The relevant regulatory deadlines for the submission of factual information were amended some four years ago, with an effective date of May 10, 2013.  *See Definition of Factual Information and Time Limits for Submission of Factual Information*, 78 Fed. Reg. 21246 (Apr. 10, 2013).  At that time, Commerce re-categorized the definitions of factual information and moved all administrative time limits for such submissions to before the preliminary determination.  *See generally* 19 C.F.R §§ 351.102(b)(21) & 351.301.  The stated purpose therefor was "so that [Commerce] may review and analyze factual information at the appropriate stage in the proceeding, rather than be required to review large amounts of information when it is too late to adequately conduct its analysis". 78 Fed. Reg. at 21248.  The amendment set forth five categories of factual information, currently defined at 19 C.F.R. §351.102(b)(21), and deadlines for same.

fifth regulatory category, which covers "factual information not directly responsive to or relating to" the other four categories and bears a deadline of the earlier of 30 days prior to the scheduled date of the preliminary results of an administrative review or 14 days before verification. *See* 19 C.F.R §§351.301(c)(5). The record thus shows that the only deadline Commerce's rejection adhered to in this instance was the deadline specified in the OP List letter for submission of economic comparability information, which is simply a "modification" of an administrative "procedural rule".[11] Administration thereof is reviewed for abuse of discretion. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012).

Xinboda broadly argues that Commerce's rejection of its supplemental economic comparability information was arbitrary, because the OP List letter deadlines have not been treated as such (*i.e.*, "hard red-line deadlines") in other proceedings. The defendant, supported by the Fresh Garlic Producers Association ("FGPA"), contends such treatment in other proceedings does not prevent Commerce from enforcing deadlines in this proceeding, and that "allowing parties constantly to supplement the record with new information as it becomes 'available' would transform the

---

[11] "It is always within the discretion of . . . an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it *when* in a given case *the ends of justice require it*." *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 539 (1970) (internal quotes and citation omitted; italics added). Substantial prejudice is generally required in order to obtain relief from such modification or relaxation. *American Farm Lines*, 397 U.S. at 539. *See* 5 U.S.C. §706 ("due account shall be taken of the rule of prejudicial error"); *see, e.g.*, *PAM S.p.A. v. United States*, 463 F.3d 1345 (Fed. Cir. 2006). "Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of *inquiry* capable of permitting them to discharge their multitudinous duties." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 543-44 (1978)) (internal quotes and citations omitted; italics added).

proceedings into Sisyphean endeavors, requiring Commerce to reconsider and to recalculate each aspect of its decision *ad infinitum*."  Def's Resp. at 31.  *See* Def-Int's Resp. at 31-38.

Paramount here is the principle that "an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem".  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).  *See also*, *e.g.*, *SKF USA v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011) (Commerce "has an 'obligation' to address important factors raised by comments from petitioners and respondents").  An arbitrary failure to consider "an important aspect of the problem" essentially gives rise to a presumption of substantial prejudice, and "agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently".  *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1371 (Fed. Cir. 2011).  Similarly arbitrary and capricious is when an agency "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice".  *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003).  "[O]nce an agency agrees to allow exceptions to a rule, it must provide a rational explanation if it later refuses to allow exceptions in cases that appear similar."  *Green Country Mobilephone, Inc. v. FCC*, 765 F.2d 235, 237 (D.C. Cir. 1985).  Such arbitrariness is likewise presumptively prejudicial. *Cf. id*.

The matter at bar is similar to *DuPont Teijin Films v. United States*, 37 CIT ___, 931 F. Supp. 2d 1297 (2013)*, and *Vinh Hoan Corp. v. United States*, 39 CIT ___, 49 F. Supp. 3d 1285 (2015), which both concerned records that were compiled prior to amendment of Commerce's regulatory time limits for such submission to prior to the preliminary determination.  The supplemental GNI data of those cases were submitted well after the surrogate country comment

deadline, yet Commerce did not reject those data as late, and both judicial decisions essentially rejected the validity of declining to consider those data on the ground that they had been submitted "too late in the proceedings to be considered by the OP when making its list of economically comparable countries". *DuPont Teijin*, 37 CIT at \_\_\_, 931 F. Supp. 2d at 1301. *See id.* at 1307*; see also Vinh Hoan* 39 CIT at \_\_\_, 49 F. Supp. 3d at 1296-97. In this instance, Commerce simply rejected Xinboda's supplemental economic comparability information as untimely without addressing Xinboda's commentary on why it believed its submission was appropriate for the record, thereby obviating further consideration thereof.

A wider context assists this analysis. Commerce's stated policy and practice on the selection of a surrogate country not on the OP List is only to resort to such a country when no country on the list provides the scope of quality data that the administrative review requires. *See*, *e.g.*, *Clearon Corp. v. United States*, 38 CIT \_\_\_, Slip Op. 14-88 (2014) at 21. Adhering to that practice in this instance, the *PDM*'s discussion on the matter thereby avoided any further discussion of Xinboda's argument, in its request for reconsideration, that rejection of its submission solely on the ground of timeliness was inconsistent with how Commerce had treated similar such submissions previously, *see infra*, *videre licet*:

> Xinboda argued that [Commerce] should consider using India or Mexico as the primary surrogate country. However, . . . the Department only departs from the countries on the OP list if we find that none of the countries on the list are significant producers of identical or comparable merchandise or there are issues regarding the availability of SVs from the countries on the list. . . . [W]e have determined that at least two countries identified on the [OP] List are significant producers of identical or comparable merchandise and that Romania provides sufficient reliable sources of data from which to derive SVs. Therefore, we have not considered using India or Mexico as the primary surrogate country and have not considered the potential SV information from those two countries.

*PDM* at 24-25.

      In other words, because Commerce ultimately identified two countries on the OP List that satisfied the statutory requirements, that circumstance precluded argument in favor of any other country not on that list -- *quod erat demonstrandum*: so long as there is at least one country on that list that satisfies the requirements of comparable merchandise, significant production and quality data, Commerce will not budge from the OP List, *i.e*, regardless of whether, at the time Commerce actually (and merely preliminarily) selects the surrogate country and announces that selection in the preliminary results, the *World Development Report* Indicators data that may in fact exist and would be relevant to a particular POR may differ from those relied upon when the OP List was compiled, *i.e,* regardless of the fact that the regulatory deadlines, as amended, for the submission of "factual information"[12] do not contemplate separate deadlines for the "economic comparability" of countries encompassed by 19 U.S.C. §1677b(c)(2)(B), and, *i.e.,* regardless of the fact that Xinboda's supplemental submission was otherwise in compliance with the administrative regulations for submission of factual information but was rejected as "untimely" solely because, in this instance, Commerce decided upon strict adherence to the deadlines for economic comparability announced in its OP List letter.  Thereby, Commerce rendered the OP List a "final" determination, *de facto*, on "economic comparability," and any comments on that list (or rebuttal thereof) a nullity.

      On the one hand, it is not inherently unjust, at least in the abstract, to subject the processing of all administrative reviews to uniform and unexceptional adherence to deadlines for the purpose of gathering information, especially where "perfect" information (in the sense of completed

---

[12]  *See* 19 C.F.R. §§ 351.301 (time limits for submission) & 351.102(b)(21) (definition of "factual information")

and extant) is concerned, such as that pertaining to sales and costs that have already occurred during the POR under review.  On the other hand, information that comes into "being" during a POR, *e.g.*, with respect to updates to country economic comparability or FOPs from publically available sources, is a harder call, due to the tension between administrative burdens and the interest in justice (*i.e.*, accuracy) that the law demands.  Perhaps for that reason, Commerce has been somewhat inconsistent in requiring strict adherence to the deadlines of its OP List letter.  *See infra*.  At any rate, the fact that the fact-gathering stage of some administrative reviews of NME subject merchandise can straddle the timing of updates to relevant and publically available GNI data, among, *e.g.*, the *World Development Report* Indicators occurring after Commerce's OP determines a list of economically comparable countries pertinent to a particular review, has been problematic, as this and other cases show.  *Cf.* Policy Bulletin 04.1 ("OP determines economic comparability on the basis of per capita gross national income, as reported in the *most current* annual issue of the *World Development Report*") (first italics added).

Commerce's OP List letter states that "it is [Commerce]'s practice to *determine* economic comparability early in a proceeding".  PDoc 153 at 1.[13]  But OP's determination of its list of economically comparable countries is not "the" determination of economic comparability that Commerce is obliged to make.  The OP List, as Commerce itself states, is only a "starting point".  PDoc 153 at 1.  The list itself is always stated to be non-exhaustive, therefore non-exclusive.  *Cf.* 19

---

[13]  Italics added.  *Cf. also*, *e.g.*, *First Administrative Review of Sodium Hexametaphosphate From the PRC: Final Results of the AD Duty Administrative Review*, 75 Fed. Reg. 64695 (Oct. 20, 2010) and accompanying issues and decision memorandum at cmt 3 ("[Commerce] relied on the most recent GNI per capita data *available* for this proceeding *at the time that economic comparability was determined* for this case") (italics added).

C.F.R. §351.408(b) ("[i]n *determining* whether *a* country is at a level of economic development

comparable to the nonmarket economy under section 773(c)(2)(B) or section 773(c)(4)(A) of the Act,

the Secretary will place primary emphasis on *per capita* GDP[14] as the measure of economic

comparability") (first italics added).  In other words, the OP's list is not determinative of the issue

of economic comparability that Commerce must decide.

Further, as the court has previously observed, "[w]hen the OP issues its list 'early in

a proceeding,' months before the preliminary results, issues of finality are not yet present". *DuPont*

*Teijin*, 37 CIT at ___, 931 F. Supp. 2d at 1306.  Apart from the OP List, nothing in the record

indicates Commerce "determined" economic comparability "early in the proceeding" within the

meaning of the statue or regulation, or otherwise communicated such a determination to the parties

prior to the preliminary results; indeed, Commerce does not "make" a surrogate country selection

until it is announced in the preliminary results, as explicitly stated in the OP List letter-

memorandum: "[Commerce] intends to announce the identification of its surrogate country selection

in its preliminary results."  PDoc 153 at 2.  Even after announcement of a surrogate country in the

preliminary results, Commerce can, and does, change its selection in the final results, because

Commerce's surrogate country decision is further based on the availability and quality of surrogate

value data available in each potential surrogate country, which information is submitted up to 20

days prior to the preliminary results (*i.e.*, 30 days prior with a 10 day rebuttal deadline).

---

[14]   Commerce's current reliance upon GNI here and in other proceedings as the better measure of economic comparability is undisputed.  *See generally Tianjin Wanhua Co. v. United States*, 41 CIT ___, ___, 253 F. Supp. 3d 1318, 1321-22 (2017).

Although "the law does not require [Commerce] to choose the *most* comparable economy, but rather a comparable economy", *Tehnoimportexport v. United States*, 15 CIT 250, 256, 766 F. Supp. 1169, 1175 (1991) (italics in original), the reality here, apart from abstraction (*cf. supra*), is that Commerce has not regarded the deadlines announced in its OP List letter memorandum as "hard red-line deadlines" in a number of prior instances, as Xinboda argued to Commerce (and here reiterates), its central point being that even after the regulatory deadlines were amended, Commerce maintained "a general practice of allowing parties to submit GNI information in later surrogate value submission well after the surrogate country comment period has passed".[15] *Cf.*, *e.g.*, *DuPont Teijin*, *supra* with Court No. 12-00088, Attachment 3 to Plaintiff DuPont Teijin 56.2 Br., ECF No. 25 (Sep. 7, 2012) (letter-memorandum to parties with OP's list together with deadlines for comments and factual information submissions).

---

[15]  Xinboda Br. at 6, referencing  Surrogate Value Submission (Aug. 31, 2015) in case no. A-570-912 at Attachment 6 (GNI data from *World Development Report* Indicators) IA ACCESS doc# 3301202-01; Surrogate Value Submission (July 16, 2015) in case no. A-570-900 at Exhibit 13 (GNI data from *World Development Report* Indicators) IA ACCESS doc# 3291511-02; Surrogate Value Submission (Mar. 31, 2015) in case no. A-570-904 at Exhibit 12 (GNI data from *World Development Report* Indicators) IA ACCESS doc# 3267659-03; Surrogate Value Submission (Nov. 4, 2014) in case no. A-570-900 at Exhibit 10 (GNI data from *World Development Report* Indicators) IA ACCESS doc# 3239651-02; Surrogate Value Submission (Oct. 31, 2014) in case no. A-570-932 at Exhibit 2 (GNI data from *World Development Report* Indicators) IA ACCESS doc# 3239156-01."). Xinboda also points to *Hardwood and Decorative Plywood Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 58273 (Sep. 23, 2013) and accompanying I&D Memo at cmt. 7 and *Folding Metal Tables and Chairs From the People's Republic of China: Final Results of 2007-2008 Deferred AD Duty Administrative Review and Final Results of 2008-2009 AD Duty Administrative Review*, 76 Fed. Reg. 2883 (Jan. 18, 2011) and accompanying I&D Memo at cmt. 4 as examples where Commerce has accepted "critically new" surrogate country data *after* the preliminary determination. *Id.* at 6-7. *Cf. Diamond Sawblades Manufacturers Coal. v. United States*, 2017 WL 3381909 at *8 (Fed. Cir. 2017) ("Commerce's willingness to consider comments related to another methodology in the case briefs filed by the parties in *Purified Carboxymethylcellulose From Finland* while refusing to do so here indicates that Commerce's decision in this case is not in accordance either with its own practices or with law").

"An action . . . becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure." *Ranchers-Cattlemen Action Legal Found. v. United States*, 23 CIT 861, 884-85 (1999), referencing *Heraeus-Amersil, Inc. v. United States*, 9 CIT 412, 416, 617 F. Supp. 89, 93 (1985).  To the extent that rule touches upon some sort of reliance interest, the better course would have been for an interested party to alert Commerce in the initial comments on economic comparability of an intention to submit supplemental information if and as it became available.  *Cf. Extension of Time Limits*, 78 Fed. Reg. 57790 (Sep. 20, 2013) *with*, *e,g,*, Surrogate Value Submission (Mar. 30, 2015) in case no. A-570-912, IA ACCESS doc# 3267470-01 ("[w]e will continue to review additional information regarding surrogate values and may submit additional surrogate value or rebuttal surrogate value information on or before the deadline enumerated in [Commerce]'s regulations, *i.e.*, thirty days before the scheduled date of the preliminary determination").  And it is also notable that Commerce treated the petitioners in the same manner as Xinboda during the 20th AR.  *See PDM* at 17 (rejecting petitioners' June 29, 2915 rebuttal comments because they contained untimely surrogate country information).  To that extent, at least, Commerce's treatment of such submissions during the proceeding was consistent.

Nonetheless, the instances to which Xinboda points implicitly underscore that Commerce's "relaxation" of its *modified* deadline in the OP List letter has (or had) been in accordance with its statutory mandate, which does require reasonable *inquiry* (*cf. Vermont Yankee Nuclear Power*, *supra*) into what is the best *available* information for, *e.g.*, comparability.  *See supra*.  And the purpose of regulation, of course, is always in service to the purpose of its enabling

legislation.[16]  In this instance, of trade law administration, the statute and regulatory deadlines are

intrinsically bound to the selection of that surrogate country that will, "to the extent possible", permit

the "best available information" to value FOPs, a decision that is also intrinsically bound to

economic comparability and surrogate selection therefrom.  *See* 19 U.S.C. §1677b(c)(1)(B); *see*

*also Vinh Hoan*, 39 CIT at ___, 49 F. Supp. 3d at 1298 ("[i]t is undoubtedly true that the selection

of the primary surrogate country is central to [Commerce]'s selection of sources to value a

respondent's factors of production").[17]

And yet, "best available information" is not defined by statute.  Thus, it has been held

to confer administrative discretion over what that constitutes. *Jiaxing Bro. Fastener*, 822 F.3d at

1293, citing 19 U.S.C. §1677b(c)(1).  But at the same time, numerous decisions have also

emphasized that it is the interested parties who bear the burden of building an adequate record to

support their case.  *E.g.*, *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).

That being the requirement, and contrary to the defendant's contention above, the statutory term

"available" (implying not only "on" but "for" the record[18]) cannot be interpreted in a manner that

would unreasonably impede a party from meeting its record-building obligation and preclude from

the record relevant factual information that otherwise comports with the regulatory deadlines for the

submission thereof, and would further the statute's objectives, *via*, *e.g.*, sudden insistence upon

---

[16]  *See*, *e.g.*, *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 369 (1973).

[17]  *Cf. PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012) ("[u]nder 19 C.F.R. § 351.301(b)(2), Avisma had until September 17, 2007, to submit factual information to [Commerce] to be used in the Final Results").

[18]  *Cf.*, *e.g.*, 19 C.F.R. §351.102(21)(iv) (data placed on the record *by Commerce*).

adherence to the "modified" regulatory deadline of the OP List letter for a specific type of factual information that, *volte face*, conflicts with the manner in which such modification has been administered in other prior proceedings -- particularly when, contrary to the expressed intention in the OP List letter to "determine" economic comparability "early in the proceeding," the agency has not even fully considered, let alone "determined," that issue.

Commerce is obviously aware of the statutory mandates to determine FOPs that are "to the extent possible" "in"[19] a country economically comparable to the level of economic development of the NME country which has significant producers of comparable merchandise, and (again with one exception not relevant here) on the basis of the "best available information regarding the values of such factors" *et cetera*.[20]   When the reality is that economic comparability has yet to be determined during the proceeding, and a party has previously complied with the original "deadline" for commenting thereon and for submitting FOP information therefor, a subsequent (attempt of) submission of relevant factual information that is otherwise within the regulatory deadline governing such factual information constitutes "available" information within the meaning and spirit of the statute.  *Cf. DuPont Teijin*, 37 CIT at ___, 931 F. Supp. 2d at 1306 ("[Commerce]'s

---

[19]  *Sic*.  *See* 19 U.S.C. §1677b(c)(1)(B) & (4).

[20]  *Id*.  Furthermore, although resort to determining NV on the basis of FOPs in an NME situation occurs when "the administering authority finds that available information does not permit the [NV] of the subject merchandise to be determined under subsection (a)," 19 U.S.C. §1677b(c)(1)(B), the general requirement of that subsection to determine NV "at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price under section 1677a(a) or (b) of this title" cannot be overlooked in the determination of relevant FOPs when an NME situation requires resort to subsection (c).

interest in the finality of the OP's list and the administrative burden of considering subsequently

released GNI data does not outweigh [Commerce]'s statutory obligations").

Commerce acknowledged Xinboda's September 17, 2015, submission as within the

regulatory deadline for submission of information to value FOPs, *i.e.*, 30 days prior to the

preliminary results in order to permit submission of rebuttal thereof and consideration, while

avoiding acknowledgment of the fact that Xinboda's supplemental economic comparability

information was likewise "within the regulatory deadline".  *Cf.* PDoc 318 at 1 *with* 19 C.F.R.

§351.301(c)(3).  Despite judicial request in prior cases for greater explanation on the subject,

Commerce did not avail itself of the opportunity to explain adequately why it "singled out" the

attempt(s) to provide updated GNI information for "special treatment" in this instance.

Even the language in the OP List letter does not make clear that information

submitted after the letter's stated deadline must be rejected and ignored; it merely implies that

Commerce may not have time to consider such information prior to the preliminary results. *Cf.*, *e.g.*,

PDoc 153 at 1 (providing "opportunity *to comment* on the list as a starting point for surrogate country

selection . . . and *to propose* for consideration other countries that are at a level of economic

development comparable to the PRC" but providing deadlines for "[t]hese *comments*" only).  And

yet Commerce clearly considered information submitted at the 30-day deadline as well as rebuttal

information 10 days later as well as pre-preliminary results comments filed less than 30 days before

the preliminary results.  *See PDM*.  But at the same time, the relative complexity of considering all

the minutiae associated with the particular FOPs involved in the production of garlic, let alone other

subject merchandise products, simply cannot compare to the relatively straightforward consideration

of country-versus-country "economic comparability" based on a listing of GNI information.  Hence,

imposing the "hard red-line deadlines" of the OP List letter in this instance (in response to which

Xinboda *did* submit timely comments and information, as aforesaid), when juxtaposed against the

other instances of record when Commerce has "relaxed" those deadlines in the past (which amounts

to *re*-modifying the "modified" deadlines of the OP List in any event)  to "allow" submission of

updated GNI information, can hardly be said to be "modify[ing] its procedural rules adopted for the

orderly transaction of business before it when in a given case *the ends of justice* require it",

*American Farm Lines*, *supra*, 397 U.S. at 539 (italics added), *i.e*, the statutory mandate of

determining margins as accurately as possible, *see*., *e.g.*, *Nan Ya Plastics Corp. v. United States*, 810

F.3d 1333, 1343 (Fed. Cir. 2016) ("clarify[ing] that 'commercial reality' and 'accurate' represent

reliable guideposts for Commerce's determinations'), or to amount to a rational "pursu[it of a]

method[ ] of *inquiry* capable of permitting [Commerce's analysts] to discharge their multitudinous

duties", *Vermont Yankee Nuclear Power*, 435 U.S. at 543 (italics added).  Once again: preliminary

results are just that, preliminary -- Commerce has until the final results to make its decision.

Towards that end, therefore, it is also rather oblique if not disingenuous for Commerce to claim it

cannot consider surrogate country comments after the OP List letter deadline when that deadline is

itself still "early in the proceeding".

　　　　　The foregoing does not resolve to a coherent rational whole, nor can the court

overlook the fact that Commerce's rather "terse" explanation for rejecting Xinboda's supplemental

submission ignores the entirety of *DuPont Teijin*'s numerous holdings on the administrative burdens

*vis-à-vis* the AD duty statute and finality.[21] The defendant cites to *Essar Steel*, *PSC*, and *Dongtai Peak Honey* as support for its position, emphasizing that Commerce is "not required to demonstrate good cause for rejecting [a respondent's] untimely submissions"[22], however those cases are distinguishable from the facts at bar.

In *Essar Steel*, a party requested that Commerce reopen the record on appeal and admit new documents. 678 F.3d at 1276-77. The court was rightly concerned not only with the fact that the party had the burden to create an accurate record during the investigation (the party had the correct documentation it wished to submit on appeal during the investigation but chose not to submit it) and with the interests of efficiency and finality. In the case at bar, by contrast, Xinboda was requesting Commerce to consider information properly submitted under the regulation of the exact

---

[21] *E.g.*: "[Commerce]'s reliance on the administrative burdens of reconsidering the OP's list do not excuse it from complying with its statutory obligations to determine accurate dumping margins, including its statutory obligation to use data from an economically comparable country"; and Commerce's "position . . . conflicts with its established practice of permitting parties to submit factual information to 'rebut, clarify, or correct' information placed on the record by [Commerce]"; and "[w]hen the OP issues its list 'early in a proceeding,' months before the preliminary results, issues of finality are not yet present"; and "[Commerce]'s interest in the finality of the OP's list and the administrative burden of considering subsequently released GNI data does not outweigh [Commerce]'s statutory obligations here and does not permit [Commerce] to completely eliminate any meaningful opportunity to submit factual information related to economic comparability"; and "time constraints do not automatically trump Commerce's statutory obligation to determine accurate dumping margins with surrogate data from an economically comparable country"; and Commerce (here as well) "has not provided a reasoned justification for singling out the OP list as factual information placed on the record by Commerce that the parties cannot rebut, clarify, or correct." *DuPont Teijin*, 37 CIT at ___, 931 F. Supp. 2d at 1306. *See also Vinh Hoan*, 49 F. Supp. 3d at 1301 (discussing the "data covering 7 out of 12 months of the POR . . . may affect its choice of a primary surrogate country.").

[22] Def's Resp. at 34, quoting *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1356, 1352 (Fed. Cir.2015). *See also Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012); *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751 (Fed. Cir. 2012).

type of information Commerce was considering for the preliminary results due three months later. And unlike in *Essar Steel*, the information was not "withheld" by Xinboda, the information Xinboda sought to submit was not yet published by the World Bank at the time of OP compiled its list. Moreover, reopening a record after a decision has been made and a degree of finality attaches is entirely different from the circumstances at bar, where Commerce did not have an interest in finality or efficiency at the point where it rejected Xinboda's supplemental factual submission, because economic comparability was still an open question at that point. Thus the defendant's suggestion that Xinboda's reasoning would require "Commerce to consider reopening and supplementation and to recalculate each aspect of its decision *ad infinitum*", Def's Resp. at 31, is inaccurate. Rather than transforming the proceeding into "Sisyphean endeavors", Xinboda was apparently and simply requesting that Commerce do precisely what it was already in the process of doing, *i.e*, determining the primary surrogate country, but with, Xinboda here claims, more and more accurate information.

In *PSC*, a party attempted to submit an affidavit with its administrative case brief. The court held that Commerce has discretion to "set and enforce deadlines", of course, and that a court "cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered." 688 F.3d at 760-61. But it was also clear from the facts of that case that the affidavit that the plaintiff attempted to submit contained brand new information, not allowed in a case brief, which was submitted well after the preliminary results and well after the regulatory deadline to submit new information. *Id.* at 757. *PSC* is also unlike the circumstances at bar.

*Dongtai Peak Honey* broadly holds that accuracy concerns cannot overcome Commerce's ability to enforce its procedural deadlines for submission of questionnaire responses and for requests for extension thereof. Under the facts of that case, Commerce had earlier warned the plaintiff-respondent, in granting its eleventh-hour request for an extension of time, of the need to "plan accordingly" in future, 777 F.3d at 1347, and the respondent was, subsequently and clearly, untimely in attempting -- twice -- to request another extension of time to respond to a supplemental questionnaire. In denying those requests, Commerce also noted its earlier caution to the respondent about timeliness. *Id*. *Dongtai Peak Honey* is also unlike the circumstances at bar.

In contrast to those cases (and as mentioned previously), Xinboda did provide timely comments on economic comparability and FOP information in the first instance, and its submission of factual information was well within the regulatory deadline for submission thereof (*i.e.,* 30 days prior to the preliminary results, November 2, 2015). The deadline of June 11, 2015, in the OP List letter to submit any information related to surrogate country selection is itself not a regulatory deadline but a modification of one, and Commerce's "adherence" to the deadlines of that letter in other and in this very proceeding does not appear to have been a model of consistency. For example, while Commerce also states in its OP List letter that in order for surrogate value information to be considered in the preliminary results, it must be submitted by June 17, 2015, yet in this case (and, Xinboda argues, in every case even with the same language in the letter), Commerce considered surrogate value information submitted after this point up through and including the submission that parties submit at the very last day (30 days and 20 days prior to the preliminary results) -- which is consistent with its regulation: Commerce references submissions from November 2 in its

preliminary results and even relies on a financial statement submitted on November 2 -- well after the initial OP List letter "deadline" of June 17, 2015 for submission of that information. Prelim. SV Memo at 14, PDoc 401. *See also supra*.

Granted, the OP List letter makes explicit reference to the deadlines of the regulation for the purpose of submitting FOP information (thereby undercutting its own "deadline" in the OP List letter) and does not do so with respect to economic comparability, but the bottom line here is that Commerce was not "denied" the reasonable amount of time contemplated by the purpose of the timing regulation (as amended to 19 C.F.R. §351.301) to consider the surrogate country information submitted on September 17, 2015 ahead of its preliminary results, which were due November 30, 2015, or, for that matter, for its final results due June 20, 2016. The regulation does not contemplate a separate deadline for surrogate country information. *See* Xinboda Br. at 2-7 (discussing the regulation). In view of the foregoing, the matter requires remand for reconsideration of the decision to reject Xinboda's supplemental September 17, 2015 submission as untimely.[23]

### B. Xinboda's Remaining Challenges

Xinboda separately challenges Commerce's selection of Romania as the primary surrogate country from which to select the FOPs and Commerce's calculation of inland transportation and brokerage and handling expenses. *See IDM* at 4-16, 30. On the first issue

---

[23] Once again: "[i]f administrative constraints prevent Commerce from considering economic comparability after a certain point in the administrative process, that is, prior to the existing regulatory deadline for the submission of factual information, Commerce may create a reasonable deadline for the submission of GNI data pursuant to the requirements of the APA." *DuPont Teijin*, 37 CIT at ___, 931 F. Supp. 2d at 1307. The court has also considered the parties' other arguments on this issue but concludes that further discussion of them would not materially advance this decision

Xinboda argues that the Romanian garlic market is distorted by import tariffs and that Commerce

should have selected Mexico, or, in the alternative, India or Thailand.  Xinboda Br. at 15-36.  On the

second issue Xinboda argues that Commerce erred in using a 10,000 kg denominator from the World

Bank's report entitled "Doing Business 2015 Romania".  *Id*. at 33.  These issues are not part of the

"case or controversy" at this point.  *Cf*. section A, *supra*, *with*, *e.g.*, *Tregea v. Bd. of Directors of

*Modesto Irrigation Dist.*, 164 U.S. 179 (1896).

### III.  *QTC's Challenges*

QTF's separate motion for judgment challenges Commerce's determination that QTC

did not cooperate to the best of its ability and the resulting determination to apply total adverse facts

available (total AFA) as well as Commerce's rejection of its separate rate information, conclusion

that it is part of the PRC-wide entity, and assignment to it of the PRC-wide rate of $4.71/kg.  It

contends that the dispute here relates to the extent to which Commerce may appropriately rely on

PRC government regulations relating to PRC's phytosanitary inspection program to conclude a

respondent fails to cooperate to the best of its ability and whether it is appropriate to conclude that

respondent is part of the PRC-wide entity.

### A.  Background

QTF first shipped subject garlic to the United States during the November 1, 2006,

through April 30, 2007 period and participated in a new shipper review that determined QTF to have

been free of state control and entitled to the separate rate of 32.78 percent, significantly lower than

the PRC-wide rate of 376.67 percent.  *See generally Kwo Lee, Inc. v. United States*, 39 CIT ___, 70

F. Supp. 3d 1369 (2015) ("*Kwo Lee*"); *Fresh Garlic from the PRC*, 73 Fed. Reg. 56550 (Sep. 29,

1008) (*inter alia*, 12th new shipper reviews).  The 32.78 percent rate applied only when QTF was

both the exporter and the producer of the subject garlic.  *Id.*

   Until the POR at bar, QTF had been dormant in exporting garlic into the United

States.  During the POR, it began to ship large quantities of garlic into the United States, *see, e.g.*,

*Kwo Lee*, 39 CIT at ___, 70 F. Supp. 3d at 1372, purportedly due to the fact that cash deposit rates

for all other companies except one had increased to a point where QTF's cash deposit rate became

competitive,  QTF Br. at 5.  The importer of record claimed that the garlic entries were eligible for

QTF's AD duty rate, but U.S. Customs and Border Protection (Customs) was unable to determine

that QTF was, in fact, the producer.   *Id.*   Customs thus required the importer of record to post

additional security equal to the PRC-wide AD duty rate.  *Id.*  The importer sought judicial review

thereof and the higher security was preliminarily enjoined in that process, but the higher security was

ultimately sustained because "Customs reasonably determined that it could not verify that QTF was

the producer" of the subject garlic.  *Kwo Lee*, 39 CIT at ___, ___, 70 F. Supp. 3d at 1373, 1376-77.

   The garlic entries considered in *Kwo Lee* were encompassed by 20th AR's initiation

on December 23, 2015.  PDoc 23.  *See Kwo Lee*, 39 CIT at ___, 70 F. Supp. 3d at 1372.  QTD draws

attention to the fact that after the *Kwo Lee* case, it voluntarily participated in this 20th AR before

becoming a mandatory respondent and was "pre-warned" of the importance of the link between the

PRC Inspection and Quarantine ("CIQ") phytosanitary certificates and the "producer".  *See* QTF

Reply at 5, referencing *IDM* at 2.  QTF's May 5, 2015 Section A questionnaire response certified

that it produced all of its subject garlic in the QTF facility located in Qingdao City.  PDoc 163 at

A-13; *see also* CDoc 82 at Exh. A-12; PDoc 175 at D-3-D-4.  QTF further stated that it had "no

relationship with any other producer or exporter" of garlic from the PRC, and that it "does not coordinate with other exporters in setting prices or in determining which companies will sell to which markets." PDoc 163 at A-3, A-5, A-8.   In its Section D questionnaire response, QTF also certified that it produced all the merchandise under consideration in its manufacturing facility in Qingdao City.  PDoc 175 at D-3-D-4.  QTF also submitted CIQ certificates as part of its garlic export documentation.  CDoc 91-95 at Exh. 18.  QTF also stated that all of its purchasing, processing, and selling activities took place "at the QTF facility, where the processing workshops, warehouses, sales and administrative office are located."  PDoc 163 at A-13.

In response to QTF's submissions, the petitioner FGPA submitted information regarding the legal, regulatory, and administrative framework of the Chinese inspection and quarantine regime that produces the CIQ certificates.  *See* PDoc 182 at Att. 1.  As described by FGPA, the applicable law and regulations required exported foods to be inspected at the CIQ inspection bureau with jurisdiction over the geographic area where the manufacturer was located. *Id.*, Att. 1, at 4-5, 7.  Those authorities also required each manufacturer to register with the relevant PRC authority and to receive a unique CIQ code.  *Id.*, Att. 1 at 4-6.  The CIQ certificates issued after the inspection contain the manufacturer-specific CIQ code and the location of inspection.  *Id.*, Att. 1 at 6-9; *see also* CDocs 91-95 at Ex. 18.

Commerce then issued a supplemental questionnaire asking QTF to explain discrepancies in its CIQ certificates.  PDoc 303; CDoc 136.  Among other discrepancies, Commerce asked QTF to explain why some CIQ certificates reflected companies other than QTF as the producer.  CDoc 136 at 3 (listing the other producers as "[[

]]"). Commerce also asked QTF to explain why many CIQ certificates showed inspection locations other than Qingdao City, the location where QTF certified that all of its garlic was processed. CDoc 136 at 3. The questionnaire also asked QTF to explain why its CIQ certificates showed that more than [[

]] kilograms of garlic were inspected in [[          ]], more than [[          ]] kilograms of garlic were inspected in [[          ]], and only less than [[          ]] kilograms of garlic were inspected in Qingdao City. CDoc 136 at 3.

In its response on September 17, 2015, QTF stated that it was the processor of all garlic, but had purchased some raw garlic from one of the producers listed in Commerce's questionnaire, [[          ]]. CDoc 146 at 2-3. QTF further stated it had no business relationship with the other producer listed in Commerce's supplemental questionnaire, [[          ]], speculating that "[[          ]] may have been used by an agent to perform the [[          ]]." *Id*. at 3. With respect to the processing locations, QTF stated that the CIQ certificates from other locations, including [[          ]], "were actually processed and packed by QTF at its facility in Qingdao." *Id*. at 3; *see also* CDoc 148 Exh. 7 (providing "sample" production records). And although QTF clarified that the CIQ certificates showed less than [[          ]] kilograms of garlic produced in [[          ]], it conceded that the CIQ certificates showed that more than [[

]] kilograms of garlic were inspected in locations other than Qingdao City. CDoc 146 at 5.

FGPA responded on October 5, 2015, reiterating that PRC law requires food exports to be inspected at the CIQ bureau in the location where the food was manufactured. PDoc 327 at 2. Because the CIQ certificates reflect the manufacturing location rather than the origin of raw

inputs, FGPA explained that QTF's purchases of raw inputs from another company would not explain the discrepancies in the CIQ certificates.  *Id*. at 18-19.  And because many of the CIQ certificates showed manufacturing locations other than Qingdao City, FGPA argued that QTF's garlic was produced by other companies.  *Id*. at 2.  FGPA further argued that many of the CIQ certificates "either lack information" regarding the manufacturer code and the location of the inspection bureau, "or have a CIQ code belonging to a different entity."  PDoc 327 at 13.

QTF responded on October 14, 2015 and continued to argue that it was, in fact, the producer of all garlic entries.  PDoc 338 at 3 (citing CDoc 152 at Exh. 11); *see also*, *e.g.*, CDoc 159 at A-2-A-3.

In the preliminary results, Commerce found that "QTF was not the sole producer of the garlic it reported in its sales database and that necessary information [was] not on the record." *PDM* at 13; *see also* CDoc 167 (AFA memorandum).  Without "complete information" regarding the producers of the subject merchandise, Commerce explained that it could not determine that QTF's reported factors-of-production information was accurate or complete.  *PDM* at 13. Commerce preliminarily concluded "that QTF's various explanations" for the discrepancies in its CIQ certificates were "not credible" and that other entities "produced the bulk" of the garlic that QTF reported to Commerce.  *Id*. at 14.  Accordingly, Commerce preliminarily relied on facts available pursuant to 19 U.S.C. §1677e(a), finding that QTF "withheld requested information, failed to provide requested information by the established deadlines and significantly impeded the proceeding."  *Id*. at 13.  In light of QTF's failure to provide complete information regarding its processors and factors of production, moreover, Commerce found that QTF failed to cooperate to

the best of its ability and preliminarily applied total adverse facts available (AFA). *Id*. at 13; *see also* 19 U.S.C. §1677e(b).

In the final decision, Commerce determined (1) to apply adverse facts available with an adverse inference to QTF, and (2) to treat QTF as part of the PRC-wide entity subject to the PRC-wide rate of $4.71 per kilogram.  IDM at 3-6, 23.  QTF disputes each of these findings.  QTF Br. at 11-19.

### B.  Application of AFA

Commerce must follow a two-step process to apply facts available with an adverse inference ("AFA").  19 U.S.C. §1677e.  First, Commerce must use facts otherwise available to fill gaps in the record either (1) if necessary information is not available on the record, or (2) if an interested party withholds information requested by Commerce, fails to provide the information by the applicable deadlines or in the form and manner requested, significantly impedes the proceeding, or provides information that cannot be verified.  *Id*. §1677e(a).  This has been interpreted to mean Commerce uses facts available when "it has received less than the full and complete facts needed to make a determination because a party has failed to provide requested information within the deadline for submission."  *Fresh Garlic Producers Assoc. v. United States*, 39 CIT ___, ___, 121 F. Supp. 3d 1313, 1324 ( 2015), citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("*Nippon Steel*").

Second, if an interested party fails to cooperate to the best of its ability, Commerce "may" apply an adverse inference in selecting among facts otherwise available.  19 U.S.C. §1677e(b).  An interested party fails to cooperate to "the best of its ability" when it "fails to put forth

its maximum effort to provide Commerce with full and complete answers to all inquiries." *Nippon Steel*, 337 F.3d at 1382. In that regard, a party is obligated to conduct a reasonable inquiry to investigate the accuracy of information that it submits to Commerce. *See PAM, S.p.A v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of [the] respondent's ability, regardless of motivation or intent."[24] *Nippon Steel*, 337 F.3d at 1383.

Commerce applied "total" AFA[25] to QTF. *IDM* 3-5; *PDM* 17-20. QTF challenges that determination, arguing that it cooperated to the best of its ability. QTF Br. at 11-20. The defendant responds that Commerce determined that QTF provided inconsistent and unreliable information in its Section A submissions, including its separate rate information; that QTF's submissions contained discrepancies indicating that other PRC garlic companies produced the bulk of QTF's claimed garlic; that QTF's attempts to explain those discrepancies contained misrepresentations; that QTF failed to cooperate to the best of its ability; and that therefore Commerce applied facts otherwise available with an adverse inference, disregarded QTF's separate

---

[24] Further, the purpose of AFA is "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Statement of Administrative Action, Uruguay Round Agreements Act ("SAA"), H.R. Rep. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040, 4197 (1994). Thus, Commerce may consider the extent to which a party may benefit from its own lack of cooperation when considering the application of an adverse inference. *See Nippon Steel*, 337 F.3d at 1381-83.

[25] "Total" AFA is not referenced in either the statute or the agency's regulations, but is understood to refer to a combination of Commerce's application of the "facts otherwise available" and "adverse inferences" provisions of 19 U.S.C. §1677e to all determinations with respect to a company after rejecting as untrustworthy all information submitted by that company in a trade proceeding. *See Yantai Xinke Steel Structure Co. Ltd. v. United States*, 36 CIT ___, Slip Op. 12-95 at 4 n.6 (2012).

rate information, and treated QTF as part of the PRC-wide entity.  *See*, *e.g.*, *IDM* at 3-5; PDM 17-20.

QTF argues to the contrary, but Commerce's determinations with respect to QTC are supported by

substantial evidence and in accordance with the law.  *See IDM* at 23-27.  As discussed below,

Commerce's application of adverse facts available is supported by substantial evidence and in

accordance with the law.

QTF challenges Commerce's decision for two primary reasons, arguing that (1) "QTF

did process all the garlic shipped," and (2) QTF "cooperated to the best of its ability."  QTF Br.

11-13.  Each of these arguments is unpersuasive.  As an initial matter, the question is not, as QTF

argues, whether substantial evidence supports its position, *see*, *e.g.*, QTF Br. at 11, 13, but whether

Commerce's decision is supported by substantial evidence.  *See Eurodif*, 555 U.S. at 316 n.6.  QTF

contends that the heart of the case is Commerce's presumption that the PRC authorities required

"strict compliance" with its CIQ certification procedures and asks whether Commerce can "shift the

burden on QTF to provide evidence that the [PRC] authorities were flexible and did not require strict

compliance", QTF Reply at 6, but the point here is rather that it is QTF that carries the burden of

showing that the record contains no substantial evidence to support Commerce's findings.  *Ad Hoc*

*Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citing 19

U.S.C. § 1516a(b)(1)(B)(i)).  It does not make that showing here, its question essentially impugns

the reasonableness of holding the PRC to its own word (law) on the subject, and substantial evidence

of record supports Commerce's finding that QTF did not process all of the garlic that it claimed

during the period of review.  QTF submitted CIQ forms for the garlic entries it claimed to have

produced during the relevant period, CDoc 91-95 at Ex. 18, but, as Commerce explained, the "vast

majority" of these CIQ certificates listed inspection bureaus "without jurisdiction" over QTF's production facility in Qingdao City. *IDM* at 23. Many certificates also showed "CIQ numbers uniquely associated with producers other than QTF." *Id*. at 23-24. The record thus supports reasonably concluding that QTF was not the producer of the garlic covered by these certificates despite QTF's statements to the contrary and also supports finding that QTF's questionnaire responses contained "misrepresentations" regarding the true producer of the relevant garlic in light of QTF's representation that it had produced all subject garlic in its facility in Qingdao City. *IDM* at 23-24.

   Throughout its brief, QTF discusses whether it was the "processor" of the garlic, which herein is assumed to be synonymous with the question of whether QTF "produced" the garlic entries, and QTF contends that Commerce refused to credit "irrefutable evidence" that QTF "produced" all of the garlic in its sales database. QTF Br. at 12. Although QTF's brief does not describe the contents of the purportedly "irrefutable" evidence, QTF Br. at 11-12, it presumably refers to the evidence that it submitted to Commerce in an attempt to overcome the discrepancies in the CIQ certificates. *See*, *e.g.*, *IDM* at 24. Commerce found that QTF's three arguments to explain the CIQ discrepancies were "not credible" and showed that QTF's questionnaire responses "contained misrepresentations." *IDM* at 24, citing CDoc 167.

   As its first proffer to Commerce, QTF argued that the location-discrepancies in the CIQ certificates occurred because of [[                              ]]. CDoc 167 at 3. Commerce found that the declaration of QTF's own manager was inconsistent with that theory, instead stating that [[                                                        ]]. *Id*.

Applicable PRC regulations on the record likewise required that inspections must "take place in the jurisdiction where the processor/exporter is located." *Id*.  Accordingly, QTF's CIQ certificates should have been inspected at the Qingdao City bureau with jurisdiction over QTF's processing facility, and the fact that many of those certificates reflected other inspection locations is substantial evidence to support Commerce's finding that QTF was not the processor for all of its claimed garlic. *See* IDM at 24.

Second, QTF argued that it sent the garlic to be inspected in other locations because they "were better suited for those inspections." *See* CDoc 167 at 4.  However, the record lacks evidence to support concluding that QTF shipped its garlic from its facility in Qingdao City to [[                    ]] for inspection and then "back to Qingdao City for export." *Id*.  To the contrary, QTF reported that its first shipment occurred on the same date that the CIQ certificate and other documentation were issued, *id*., which Commerce found was inconsistent with QTF's argument that it shipped garlic back and forth between its own processing facility and inspection bureaus in other locations.  CDoc at 167 at 4.

Third, QTF argued that only one of the other processors listed on its CIQ certificates, [[             ]], supplied fresh garlic to QTF.  CDoc 167 at 4.  QTF speculated that the other entity, [[         ]], appeared on the CIQ certificates because it may have been used by an agent to perform [[                    ]]. *Id*.  Commerce found, however, that such a scheme would have been inconsistent with PRC regulations, which require inspections to "take place in the same jurisdiction where the processor/exporting company is located." *Id*.  In any event, QTF's theory would not explain why [[                         ]] were listed as the manufacturers of garlic on the CIQ

certificates.  Accordingly, Commerce properly concluded that "it appears that some of the garlic

included in QTF's sales data base was produced by [[                                    ]]."  *Id*. at 5.

QTF also argued that it would make no economic sense for QTF to export garlic

processed by another entity.  *See IDM* at 24; *see also* CDoc 179-81.  As Commerce explained,

however, QTF increased its exports immediately after Commerce increased the cash deposit rates

for other Chinese exporters.  *IDM* at 26.  QTF had a comparatively low cash deposit rate at the time,

and the CIQ records reveal that QTF took advantage of its own low cash deposit rates by exporting

garlic "from third-party processors" at QTF's low rates.  *Id*.  As Commerce determined, "QTF

clearly had its reasons for engaging in this type of business model."  *Id*.

QTF argues that Commerce lacks competence to rely on Chinese regulations, because

"[t]here is no record evidence that any [PRC] government authority found a third party was the

processor rather than QTF."  QTF Br. at 13.  But, as Commerce explained, "QTF has not provided

any information to support its contention" that the PRC government does not enforce its own CIQ

regulations.  *IDM* at 24.  QTF assumes the CIQ certificates are noncompliant with PRC regulations --

by listing inspection locations other than Qingdao City and manufacturers other than QTF -- but QTF

provided no satisfactory reason why Commerce should assume noncompliance rather than

concluding, as it did, that the CIQ certificates were consistent with PRC regulations and showed that

manufacturers other than QTF produced the "bulk" of QTF's claimed garlic.  *See*, *e.g.*, *IDM* at

23-24.

Given no satisfactory explanation for the record discrepancies in the CIQ certificates,

Commerce found that QTF "misrepresent[ed]" the producers for the "bulk" of the garlic in its sales

database and failed "to report all of its processors." *IDM* at 24.   Without such explanation,

Commerce was also unable to rely on QTF's submissions regarding (1) factors of production, (2)

affiliated producers, (3) intermediate parties in the production of subject merchandise, and (4)

unaffiliated producers involved in supplying garlic.   *IDM* at 24.   Such misrepresentations and/or

omissions, above, are substantial evidence that supports Commerce's finding that QTF "withheld

requested information, failed to provide requested information by the established deadlines, and

significantly impeded the proceeding."  PDoc 400 at 3.   QTF argues that it did respond completely

to Commerce's requests, QTF Br. at 12, but from Commerce's perspective "QTF failed to create an

adequate record to explain or otherwise rebut the discrepancies obvious on the face of its CIQ

certificates." *IDM* at 24.   The court cannot substitute judgment for Commerce's finding that QTF's

explanations for the discrepancies were not credible and demonstrated a failure to cooperate to the

best of its ability (*see* PDoc 400 at 5).   *Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1359

(Fed. Cir. 1999).

QTF also argues that "Commerce failed to specify" what requested information QTF

failed to supply.   QTF Br. at 11.   As Commerce explained, however, QTF's misrepresentations

regarding the producers of its garlic meant that QTF failed to submit necessary information regarding

its garlic production, which, in turn, implicated other information regarding factors of production,

affiliation, and independence from government control.   *IDM* at 23-24; PDoc 400 at 3, 5.   And QTF

does not contest that Commerce provided an opportunity to remedy or to explain the deficiencies in

the record.   *See* 19 U.S.C. § 1677m.

Finally, QTF argues that Commerce's findings are inconsistent with the Statement of Administrative Action, which states that:

> [N]ational authorities should calculate costs on the basis of exporter's and producer's records, provided that such records are in accordance with generally accepted accounting principles in the exporting country and reasonably reflect the costs associated with producing and selling the merchandise.

QTF Br. at 12 n. 44, quoting SAA, H.R. Rep. No. 103-316 (1994) at 139.  That section, however, describes the procedures for calculating sales below cost, a procedure that is not at issue in this case, nor does anything in the quoted material require Commerce to accept records at the respondent's insistence, especially when, as in this case, the record evidence reveals that the respondent misrepresented important information.  *See IDM* at 24.

Accordingly, Commerce found that "QTF withheld requested information, failed to provide requested information by the established deadlines, and significantly impeded the proceeding," requiring application of facts otherwise available.  *IDM* at 23,  citing 19 U.S.C. § 1677e(a)(2)(A)-(C).  And because QTF failed to cooperate to the best of its ability, Commerce applied total adverse facts available.  *IDM* at 23, citing 19 U.S.C. § 1677e(b).  On this record, the court cannot hold Commerce's finding and the consequence thereof unreasonable.

## C.  Separate Rate Eligibility

Commerce disregarded QTF's separate rate information as unreliable, found that QTF did not establish its eligibility for a separate rate, and applied the underlying presumption of government control in non-market economy countries.  *IDM* at 25-27.  Accordingly, in the final results Commerce included QTF in the PRC-wide entity and applied the $4.71 per kilogram PRC-wide rate.  *Id*. at 27.   QTF argues here that "[t]here is no evidence that QTF was ever part" of

the PRC-wide entity and that Commerce failed to conduct the necessary analysis with respect to its

separate rate status, and that Commerce should have accepted its separate rate certification. QTF

Br. at 13-16. As discussed below, these arguments are unpersuasive.

In NME proceedings, Commerce presumes that all respondents are

government-controlled unless a respondent rebuts this presumption by establishing the absence of

*de jure* and *de facto* government control. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802

F.3d 1339, 1353 (Fed. Cir. 2015). If a respondent fails to establish its independence, Commerce

relies upon the presumption of government control and applies the country-wide rate. *Id*. Because

the country-wide rate "presumes government control," Commerce may not apply the country-wide

rate when "the respondent has established independence from government control" -- even if

Commerce has applied AFA to other information by the same respondent. *Qingdao Taifa Grp. v.

United States*, 33 CIT 1090, 637 F. Supp. 2d 1231, 1098, 1240-41 (2009) (citation omitted). Several

decisions have held that Commerce may not disregard separate rate information when "there is no

indication that any necessary information was missing or incomplete." *See*, *e.g.*, *Shandong Huarong

General Group v. United States*, 27 CIT 1568, 1594 (2003) (citation omitted).

Nevertheless, Commerce may disregard a company's separate rate submission if the

record supports finding that the submission consists entirely of information derived from unreliable

sources. *See*, *e.g.*, *Fresh Garlic Producers Ass'n v. United States*, 39 CIT ___, ___, 121 F. Supp.

3d 1313, 1328 (2015) ("Commerce's determination that a party is not entitled to a separate rate

because its separate rate information is unreliable must be based on substantial evidence") (citing

*Gerber Food (Yunnan) Co. v. United States*, 29 CIT 753, 772, 387 F. Supp. 2d 1270, 1287 (2005));

*Hebei Golden Bird Trading Co. v. United States*, 41 CIT ___, Slip Op. 17-86 (July 17, 2017) at 11

(information impugning separate rate submissions provides substantial evidence to support

determination of ineligibility for separate rate); *Jiangsu Changbao Steel Tube Co. v. United States*,

36 CIT ___, ___, 884 F. Supp. 2d 1295, 1310 (2012) (finding specific evidence on the record to

support concluding that a separate rate application presents no reliable evidence).

      As outlined above, Commerce found that QTF misrepresented that it was the producer

of its subject merchandise.  *IDM* at 24-25.  This misrepresentation appeared in QTF's Section A

questionnaire responses, and revealed deficiencies in other portions of the same responses, including

the separate rate information.  *Id*. at 25.  Commerce found that QTF failed to submit "complete

information regarding QTF's relationships with other entities that produced the bulk of its subject

merchandise".  *Id*.  Those other entities were not part of this review, did not establish separate rate

status, and are thus presumed to be part of the PRC-wide entity.  *See*, *e.g.*, CDoc 15. QTF's

relationship with those entities, in turn, implicated "whether QTF was subject to government

control." *IDM* at 25.  "Given QTF's implausible explanations" and misrepresentations, Commerce

found that it was "unable to consider any information in QTF's Section A response, and specifically

its information relating to government control."  *Id*.  Accordingly, Commerce disregarded QTF's

separate rate information as unreliable and treated QTF as part of the PRC-wide entity.  *Id*.

      Commerce's decision to disregard QTF's separate rate information is supported by

substantial evidence and complies with the law.  This case is similar to *Jiangsu*, on which the court

sustained Commerce's decision to disregard the respondent's separate rate application because of

deficiencies in that application.  *See Jiangsu*, 884 F. Supp. 2d at 1310.  Therein, Commerce found

that company officials had misled during verification and that the company's computer software was unreliable. *Id*. at 1303. Because the respondent's separate rate application contained only representations by the discredited officials, Commerce denied the separate rate application. *Id*. at 1309. As the court explained, Commerce's decision was based on "specific findings" that the respondent's "submissions regarding government control were not credible." *Id*. The court further explained that Commerce's decision was not based solely on an indiscriminate adverse inference, but instead determined that the separate rate application itself was "unreliable." *Id*. at 1310.

In this case, Commerce likewise found QTF's separate rate information unreliable. *See IDM* at 25-27. Because of QTF's "misrepresentations" regarding the producers of its garlic, Commerce reasonably found that it could not trust QTF's related answers regarding its relationship with other producers or exporters. *See IDM* at 25. Those answers appeared in the separate rate portion of the Section A questionnaire response. PDoc 163 at A-2--A-11. As Commerce explained, it "did not receive complete information regarding QTF's relationships with other entities that produced the bulk of its subject merchandise . . . , which may have included information relating to whether QTF was subject to government control." *IDM* at 25.

QTF's answers regarding its relationship with other producers comprise a key part of the separate rate portion of the Section A questionnaire. PDoc 163 at A-3. That portion of the questionnaire asks for information regarding QTF's "relationship with other producers or exporters," and whether QTF "coordinate[d] with other exporters in setting prices". PDoc 163 at A-3, A-8. QTF responded, in relevant part, that it "has no relationship with any other producer or exporter of the merchandise under consideration." PDoc 163 at A-3. QTF further stated that it "does not

coordinate with other exporters in setting prices." PDoc 163 at A-8. Given QTF's misrepresentation

regarding the producers of its garlic, Commerce reasonably concluded that it could not rely on QTF's

responses in the separate rate portion of the Section A questionnaire. *See IDM* at 25.

As in *Jiangsu*, QTF's material misrepresentations support Commerce's finding that

QTF's representations in the separate rate portion of the questionnaire were unreliable. *Cf. IDM* at

25 with *Jiangsu*, 884 F. Supp. 2d at 1309-10. Indeed, Commerce possesses authority, pursuant to

section 1677m(d), to "disregard all or part of the original and subsequent responses" when a

respondent fails to satisfactorily remedy a deficiency. *See* 19 U.S.C. §§ 1677e(a)(2), 1677m(d).

Pursuant to such authority, Commerce properly found that "QTF's implausible explanations" left

Commerce unable to consider "any information in QTF's Section A response," including "its

information relating to government control." *IDM* at 25.

The Court of Appeals for the Federal Circuit, moreover, has repeatedly held that

Commerce may disregard all of respondent's data when a deficient questionnaire response implicates

"core" information. *See*, *e.g.*, *Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d

1339, 1357 (Fed. Cir. 2015), citing *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d

1333, 1348 (Fed. Cir. 2011). That precedent applies in this case because Commerce found that

"QTF's misrepresentations pervade the data in the record, including its Section A responses

regarding its entitlement to separate rate status." CDoc 167 at 5.

QTF argues "[t]here is no evidence that QTF was ever part of the PRC-wide entity."

QTF Br. at 13. But that argument inverts the underlying presumption in non-market economy

reviews that the respondent is subject to government control. *See*, *e.g.*, *Sigma Corp. v. United States*,

117 F.3d 1401, 1405  07 (Fed. Cir. 1997).   That presumption is valid and has been upheld by the

Federal Circuit.  *See id.*; *Huaiyin For. Trade Corp. v. United States*, 322 F.3d 1369, 1372 (Fed. Cir.

2003); *see also Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1311

(Fed. Cir. 2017) ("we consistently have sustained Commerce's application of a rebuttable

presumption of government control to exporters and producers in NME countries, such as the PRC")

(citations omitted).  The burden rests on QTF to demonstrate that it is independent from government

control.  *See Sigma*, 117 F.3d at 1405-07.   Commerce found that QTF had not made such a

demonstration because the separate rate information in QTF's Section A questionnaire response is

unreliable and deficient, thus the presumption of government control remained.  The court cannot

conclude Commerce's disregard of that information and application of the underlying presumption

of government control improper on this record.

QTF further contends that "[t]he location where garlic is inspected establishes no

evidence of ownership or control."  QTF Br. at 13.  But Commerce reasonably explained that QTF's

misrepresentations implicate its relationships with other PRC garlic producers, which are presumed

to be under government control.  *See*, *e.g.*, *IDM* at 25-27.  Indeed, neither of the companies listed

on QTF's CIQ certificates participated in this review or was eligible for a separate rate, and were

therefore presumed to be subject to PRC government control.  *See*, *e.g.*, CDoc 15; CDoc 167 at 4

(listing the companies on QTF's CIQ certificates).  QTF's undisclosed relationship with those

companies supports treating QTF as part of the PRC-wide entity.

QTF next argues that Commerce's decision is inconsistent with other cases when the

Court has held "that Commerce cannot apply the PRC-wide rate to a company that has established

its independence from Chinese government control." QTF Br. at 13-14, citing, *inter alia*, *Shenzhen Xinboda Indus. Co. v. United States*, 40 CIT ___, 180 F. Supp. 3d 1305 (2016); *FGPA v. United States*, 40 CIT ___, ___, 180 F. Supp. 3d 1233, 1237 (2016); *Yantai Xinke Steel Structure Co. v. United States*, 36 CIT ___, Slip Op. 12-95 at 26-27 (July 18, 2012). It cites, for example, a case in which the court remanded a decision in which Commerce disregarded separate rate information solely because of "deficiencies" in the respondent's "sales data." QTF Br. at 14, citing *Xinboda*, 40 CIT at ___, 180 F. Supp. 3d at 1316.

Unlike the referenced decisions, however, Commerce made specific and particularized findings regarding QTF's misrepresentation and the resulting deficiencies in QTF's separate rate information. *See IDM* at 25-26. As discussed above, this case instead parallels the *Jiangsu* decision sustaining Commerce's application of the PRC-wide rate, because QTF's misrepresentations led to deficiencies that pervade its separate rate submissions. *See Jiangsu*, 884 F. Supp. 2d at 1309. In this case, moreover, Commerce made a finding that QTF's "separate rate responses were inaccurate or deficient," and its decision to reject QTF's separate rate information is "based on substantial evidence." *See Xinboda*, 180 F. Supp. 3d at 1316 (citation omitted).

QTF nonetheless argues that Commerce should have accepted its separate rate certification, citing "Commerce procedures" that a company must submit such a certification to show eligibility for the separate rate. QTF Br. at 15, citing *FGPA*, *supra*, 180 F. Supp. 3d at 1237. As the separate rate certification form states, however, merely submitting the certificate does not automatically guarantee a separate rate. PDoc 45 at 4. Rather, Commerce may conclude that a firm is not eligible for a separate rate if it fails to "furnish supporting documents as requested" by

Commerce.  *Id*. at 2.  Further, a company selected as a mandatory respondent, like QTF, must respond to the AD "questionnaire in full in order to retain eligibility for consideration of separate rate status."  *Id*.  Merely submitting the separate rate certificate does not inoculate QTF against its misrepresentations and deficiencies in the Section A questionnaire response.  *See IDM* at 24-26. Commerce reasonably rejected QTF's separate rate information.

Based on the general proposition that Commerce must provide an adequate basis for its conclusions, QTF next contends that Commerce failed to "articulate the standard" it used in disregarding QTF's separate rate information.  *Id*. at 22 (citing *Rhone Poulenc, Inc. v. United States*, 20 CIT 573, 574-75, 927 F. Supp. 451, 454 (1996)).  But, Commerce explained that it was applying the statutory adverse facts available framework based on the deficiencies in QTF's separate rate submission.  *See IDM* at 23-26; *see also PDM* at 9-14; CDoc 167 at 3-6.  Commerce described that framework in detail, including the procedures for respondents to remedy a deficiency and the consequences for failing to do so.  *See PDM* at 9-10, citing 19 U.S.C. § 1677m.  Commerce also explained the circumstances in which it may apply facts otherwise available, and an adverse inference.  *See id*. at 9-10, citing 19 U.S.C § 1677e.  Applying those procedures, Commerce detailed the deficiencies in QTF's Section A questionnaire response regarding the separate rate.  *See IDM* at 25; *PDM* at 14.  Accordingly, Commerce properly exercised its discretion to disregard those responses.  *See* 19 U.S.C. § 1677e, 1677m(d).

Finally, QTF restates its arguments that Commerce erred in applying the adverse facts available standard.  QTF Br. at 15, 17-19.  It argues, for example, that Commerce failed to find that "QTF's separate rate responses were inaccurate or deficient," *id*. at 17, and maintains that QTF "did

not withhold any information requested by Commerce," *id*. at 18 (citing *Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d 1339 (Fed. Cir. 2015); 19 U.S.C. §1677e(a)(2)(A)-(D)). However, substantial evidence of record supports Commerce's determination that QTF did "withhold" or failed to provide correct information regarding the producers of its garlic, thereby rendering unreliable its responses regarding relationships with other producers, which is central to the separate rate analysis. *See*, *e.g.*, *IDM* at 25; *see also id.* at 23.

And despite QTF's argument that it "did cooperate" to the best of its ability, *id*. at 15, 19, substantial evidence also supports Commerce's finding that QTF misrepresented the identity of its garlic producers. *See IDM* at 23, 25. The Federal Circuit has explained that although the "best of its ability" standard "does not require perfection and recognizes that mistakes sometimes occur," it "does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Commerce found that QTF's misrepresentations in this case qualified as a failure to cooperate. *See IDM* at 25. This case is akin to *Ad Hoc Shrimp*, cited in QTF's brief, when Commerce considered "evidence indicating that the exporter's statements were false." QTF Br. at 19, citing *Ad Hoc Shrimp*, 802 F.3d at 1356. Like the respondent in *Ad Hoc Shrimp*, Commerce found that QTF misrepresented important information and did not provide correct information when given the opportunity to correct the deficiencies. *See id.*; *see also IDM* at 23, 25. Those findings merit deference. *See*, *e.g.*, *Fujian Machinery & Equip. Imp. & Exp. Corp. v. United States*, 25 CIT 1150, 1156 n.7, 178 F. Supp. 2d 1305, 1314 n.7 (2001). QTF contends Commerce did not provide "chance to rebut" pursuant to 19 U.S.C. §1677m(d), *see* QTF Reply at 7, but the fact of the matter is that during the course of the proceeding, and as a

consequence of Commerce's findings on QTF's submissions for and explanations of the record, it is QTF that failed to rebut the presumption of state control.

IV.  *Conclusion*

In accordance with the foregoing, Commerce's final results must be, and hereby are, remanded for reconsideration of the determination to reject Xinboda's September 17, 2015 submission of information related to economic comparability and factors of production for Mexico. The results of remand shall be due March 1, 2018.  Within five business day after those results are docketed, the parties shall confer and submit a proposed schedule for filing comments on the remand results.

With respect to QTF, the 20th AR Final Results must be, and hereby are, sustained. Interested parties are requested to comment by December 15, 2017 on whether the redactions in this opinion are correct, and also whether there is any "just reason" for delaying issuance of final judgment with respect to Commerce's final results for QTF, *see* USCIT Rule 54(b).

**So ordered**.

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: December 5, 2017
          New York, New York