Slip Op. 18-**179**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHENZHEN XINBODA INDUSTRIAL CO., LTD.,<br>              Plaintiff,<br><br>       and<br><br>QINGDAO TIANTAIXING FOODS CO., LTD., et al.,<br>              Consolidated Plaintiffs,<br><br>       and<br><br>JINXIANG HEJIA CO., LTD., et al.,<br>              Plaintiff-Intervenors,<br><br>       v.<br><br>UNITED STATES,<br>              Defendant,<br><br>       and<br><br>FRESH GARLIC PRODUCERS ASSOCIATION, et al.,<br>              Defendant-Intervenors. | Before: Mark A. Barnett, Judge<br>Consol. Court No. 16-00116 |

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's selection of Romania as the primary surrogate country and Romanian pricing data as the surrogate value for raw garlic. Remanding the U.S. Department of Commerce's addition of delivery costs to the surrogate value for raw garlic and calculation of Plaintiff's movement expenses.]

Dated: December 26, 2018

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, DC, for Plaintiff and Plaintiff-Intervenors.

Meen Geu Oh, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, for Defendant.  With him on the brief were Chad A.

Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and
Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief was Natan P.L.
Tubman, Attorney, Office of the Chief Counsel for Enforcement and Compliance, U.S.
Department of Commerce, of Washington, DC.

Michael J. Coursey, John M. Herrmann, Joshua R. Morey, and Heather N. Doherty,
Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenors.

     Barnett, Judge:  This matter is before the court following the U.S. Department of

Commerce's ("Commerce" or the "agency") redetermination upon remand in this case.

*See* Final Results of Redetermination Pursuant to Court Remand ("Remand Results"),

ECF No. 69-1.

     Plaintiff Shenzhen Xinboda Industrial Co., Ltd. ("Plaintiff" or "Xinboda") initiated

this action[1] challenging Commerce's final results in the 20th administrative review ("AR

20") of the antidumping duty order on fresh garlic from the People's Republic of China

("PRC" or "China"). [2]  *See* Summons, ECF No. 1; *Fresh Garlic From the People's

Republic of China*, 81 Fed. Reg. 39,897 (Dep't Commerce June 20, 2016) (final results

and final rescission of the 20th antidumping duty admin. review; 2013-2014) ("*Final

Results*"), ECF No. 30-4, and accompanying Issues and Decision Mem., A-570-831

(June 10, 2016) ("I&D Mem."), ECF No. 30-5.[3]  Specifically, Xinboda, a mandatory

---

[1] This action represents three consolidated challenges.  *See* Order (Sept. 15, 2016),
ECF No. 33 (consolidating Court Nos. 16-00114, 16-00116, and 16-00125 into lead
Court No. 16-00116).
[2] The period of review is November 1, 2013, through October 31, 2014.  *Final Results*,
81 Fed. Reg. at 39,897.
[3] The administrative record filed in connection with the *Final Results* is divided into a
Public Administrative Record ("PR"), ECF No. 30-1, and a Confidential Administrative
Record ("CR"), ECF No. 30-2.  Parties submitted joint appendices containing record
documents cited in their Rule 56.2 briefs. *See* Public J.A. ("PJA"), ECF Nos. 55 (Tabs 1-
26), 55-1 (Tabs 27-57); Confidential J.A. ("CJA"), ECF Nos. 54 (Tabs 1-26), 54-1 (Tabs

respondent in this review, challenged Commerce's (1) rejection of surrogate country

information demonstrating Mexico's economic comparability to China; (2) selection of

Romania as the primary surrogate country; and (3) calculation of movement expenses.

*See* Pl. Shenzhen Xinboda Industrial Co., Ltd.'s Mot. for J. on the Agency R., ECF No.

39, and Pl. Shenzhen Xinboda Industrial Co., Ltd. Mem. in Supp. of Mot. for J. on the

Agency R. ("Xinboda's 56.2 Br."), ECF No. 39-2; I&D Mem. at 1.  On December 18,

2017, the court remanded Commerce's rejection of surrogate country information and

deferred consideration of Plaintiff's additional challenges pending the results of

Commerce's remand redetermination.  *See Shenzhen Xinboda Indus. Co. Ltd. v. United

States*, Slip Op. 17-160, 2017 WL 6502727 (CIT Dec. 5, 2017).[4]

---

27-57).  The administrative record associated with the Remand Results is contained in a
Public Remand Record ("RR"), ECF No. 72-1.  Plaintiff submitted joint appendices
containing record documents cited in Parties' Remand briefs. *See* Public J.A. to
Remand Proceeding ("PRJA"), ECF No. 79; Confidential Suppl. J.A. ("Suppl. CRJA"),
ECF No. 85; Public Suppl. J.A. ("Suppl. PRJA"), ECF No. 86.

[4] Consolidated Plaintiffs Shenzhen Yuting Foodstuff Co., Ltd. and Shenzhen Bainong
Co., Ltd., and Plaintiff-Intervenors Jinxiang Hejia Co., Ltd., Jinxiang Feiteng Import &
Export Co., Ltd. joined Xinboda's Rule 56.2 arguments. *See* Mem. of Law in Supp. of
Co-Plaintiffs' Mots. for J. Upon the Agency R. ("Consol. Pl.'s 56.2 Br.") at 9, ECF No.
40.  Consolidated Plaintiff Qingdao Tiantaixing Foods Co., Ltd. ("QTF") filed a separate
motion. *See* Confidential Mot. of Pl. Qingdao Tiantaixing Foods Co., Ltd. for J. on the
Agency R., ECF No. 37.  Because *Xinboda* sustained Commerce's determination vis-à-
vis Consolidated Plaintiff QTF, 2017 WL 6502727, at *20, the Remand Results pertain
solely to Xinboda's challenges to the *Final Results*.  *Xinboda* presents additional
background information on this case, familiarity with which is presumed.

On March 9, 2018, Commerce filed its Remand Results.[5]  On remand,

Commerce, under protest,[6] permitted Xinboda to submit factual information regarding

Mexico's economic comparability to China.  Remand Results at 1.  Upon consideration

of this information and Mexican surrogate value data, Commerce affirmed its selection

of Romania as the primary surrogate country.  *Id.* at 1, 31.

Xinboda filed comments opposing the Remand Results.  *See* Pl. Shenzhen

Xinboda Industrial Co., Ltd. Comments in Opp'n to U.S. Dep't of Commerce's Remand

Redetermination ("Xinboda's Remand Opp'n"), ECF No. 84.[7]  Defendant United States

("Defendant" or the "Government") and Defendant-Intervenors[8] filed comments in

support of the Remand Results.  *See* Def.'s Resp. to Comments on Remand Results

("Def.'s Remand Reply"), ECF No. 78; Def.-Ints.' Comments in Supp. of the U.S. Dep't

of Commerce's Redetermination Pursuant to Remand ("Def.-Ints.' Remand Reply"),

ECF No. 77.

---

[5] Thereafter, on August 9, 2018, the action was assigned to this judge.  Order of Reassignment, ECF No. 80.

[6] By making the determination under protest, Commerce preserves its right to appeal. *See Meridian Prods. v. United States*, 890 F.3d 1272, 1276 n.3 (Fed. Cir. 2018) (citing *Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003)).

[7] Plaintiff-Intervenors joined Xinboda's comments in opposition.  *See* Pl.-Ints. Jinxiang Hejia Co., Ltd., and Jinxiang Feiteng Imp. & Exp. Co., Ltd. Comments in Opp'n to U.S. Department of Commerce's Remand Redetermination, ECF No. 74.

[8] Defendant-Intervenors include the Fresh Garlic Producers Association ("FGPA") and its individual members: Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc.  *See* Consent Mot. to Intervene as of Right at 1, ECF No. 22.  FGPA is a trade association whose members—the afore-mentioned companies—are domestic producers of the domestic like product.  *Id.* at 2.  Defendant-Intervenors were Petitioners in the underlying proceeding.  *See* I&D Mem. at 2.

For the reasons discussed herein, Commerce's selection of Romania as the primary surrogate country and selection of Romanian pricing data as the surrogate value for raw garlic are sustained.  However, the court remands for further consideration Commerce's addition of transportation costs to the surrogate value for raw garlic and calculation of Xinboda's brokerage and handling and inland freight expenses.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[9] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  *SolarWorld Ams., Inc. v. United States*, 41 CIT ___, ___, 273 F. Supp. 3d 1314, 1317 (2017) (quoting *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT ___, ___, 968 F. Supp. 2d 1255, 1259 (2014) (internal quotation marks omitted).

## DISCUSSION

### I.  Surrogate Country Selection

An antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.

---

[9] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all references to the U.S. Code are to the 2012 edition, unless otherwise stated.

When an antidumping duty proceeding involves a nonmarket economy country,

Commerce determines normal value by valuing the factors of production[10] in a

surrogate country, *see id.* § 1677b(c)(1), and those values are referred to as "surrogate

values."  Commerce may also rely on surrogate values, when appropriate, to adjust the

export price or constructed export price to account for costs incurred in "bringing the

subject merchandise from the original place of shipment in the exporting country to the

place of delivery in the United States."  *Id.* § 1677a(c)(2)(A); *see also Fine Furniture*

*(Shanghai) Ltd. v. United States*, 40 CIT ___, ___, 182 F. Supp. 3d 1350, 1368 (2016)

(noting Commerce's use of a surrogate value to calculate international movement

expenses).  In selecting surrogate values, Commerce must use "the best available

information" that is, "to the extent possible," from a market economy country or

countries that are economically comparable to the nonmarket economy country and

"significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(1), (4).

Commerce generally values all factors of production in a single surrogate

country.[11]  Commerce has adopted a four-step approach to selecting a primary

surrogate country.  *See* Import Admin., U.S. Dep't of Commerce, *Non-Market Economy*

---

[10] The factors of production include, but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

[11] *See* 19 C.F.R. § 351.408(c)(2) (excepting labor).  *But see Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011) (expressing a preference to value labor based on industry-specific labor rates from the primary surrogate country).

*Surrogate Country Selection Process*, Policy Bulletin 04.1 (2004),

http://enforcement.trade.gov/policy/bull04-1.html (last visited Dec. 18, 2018) (hereinafter

"Policy Bulletin 04.1").  Pursuant to Policy Bulletin 04.1,

> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at a comparable level of economic development to the [non-market economy] country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)–(3), Commerce will select the country with the best factors data.

*Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir.

2016) (citation omitted); *see also* Policy Bulletin 04.1.

On remand, Commerce reopened the administrative record, invited Xinboda to

resubmit information regarding Mexico's economic comparability to China, and set

deadlines for parties to rebut, clarify, or correct the information contained therein.

Remand Results at 4; *see also* Refiling Resubmission of Sept. 17, 2015 Additional

Surrogate Country List and Surrogate Country Comments (Jan. 3, 2018) ("Xinboda's SC

Comments"), RR 6, PRJA Tab 10, Suppl. CRJA Tab 2, Suppl. PRJA Tab 2; Rebuttal to

Xinboda'[s] Resubmitted Sept. 17, 2015 Additional Surrogate Country List and

Surrogate Country Comments (Jan. 10, 2018) ("Xinboda's Remand Rebuttal"), RR 8-10,

PRJA Tab 12; Pet'rs' Submission of Rebuttal Factual Information (Jan. 10, 2018)

("Pet'rs' Remand Rebuttal "), RR 11-16, PRJA Tab 13, Suppl. CRJA Tab 1, Suppl.

PRJA Tab 1.  Upon review of this information, Commerce determined that Mexico and

Romania are both at the same level of economic development as the PRC and

significant producers of comparable merchandise.  *See* Remand Results at 8-9, 11.[12]

Pursuant to Policy Bulletin 04.1, Commerce's inquiry thus turned to which country

provided the best factors data.  *Id.* at 11.

        To determine the best source of factors data, Commerce considers the degree to

which the data is publicly available, contemporaneous with the period of review, tax and

duty exclusive, representative of a broad-market average, and product-specific.  *Id.* at

11-12; *see also* 19 C.F.R. § 351.408(c)(1), (4).  Commerce's analysis of this issue is

confined to the record built by interested parties.  *See QVD Food Co., Ltd. v. United

States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).  Moreover, when selecting from among

multiple sources, Commerce's inquiry may be a relative exercise and will rarely involve

perfect data sets.  When "Commerce is faced with the choice of selecting from among

imperfect alternatives, it has the discretion to select the best available information for a

surrogate value so long as its decision is reasonable."  *Catfish Farmers of Am. v. United

States*, 33 CIT 1258, 1273, 641 F. Supp. 2d 1362, 1377 (2009).  Applying the afore-

mentioned criteria, Commerce weighed the information on the record and determined

that the Romanian data was the best available information.

        A careful review of the Remand Results indicates that Commerce's selection of

Romania over Mexico was a close call.  Publicly available data was available from both

countries.  *See* Remand Results at 12, 15, 30.  Although roughly contemporaneous

data was available from Mexico, Commerce considered the monthly data from Romania

---

[12] These findings are unchallenged.

to be more contemporaneous than the annual data from Mexico, which would be

impacted by months outside the period of review.  *Id.* at 17.  Data from both countries

was also considered tax and duty exclusive.  *See id.* at 12-13, 15, 27.  Commerce

expressly found that Romanian data represented a broad market average but made no

such finding with respect to Mexico.  *See id.* at 30.  Commerce drew distinctions,

however, regarding the specificity of the Romanian and Mexican data to the size and

price of the raw garlic input.

As to size, Commerce found that the record lacked substantial evidence to

conclude that "Mexic[an] garlic bulbs are identical or more comparable to" Chinese

garlic bulbs.  *Id.* at 30.  Commerce explained that most of Xinboda's evidence on

Mexican garlic was "completely unintelligible," and the intelligible articles, or parts

thereof, failed to support Xinboda's arguments regarding the comparability of Mexican

garlic to Chinese garlic.  *Id.* at 21-22.[13]  In contrast, Commerce found that substantial

evidence supported a finding that Romanian garlic bulbs are "similar in size to the input

garlic bulbs."  *Id.* at 30 & n.126 (quoting I&D Mem. at 10).

As to price, Commerce first considered whether Mexican or Romanian data

reflected the level of trade at which Xinboda's processor, Excelink, purchased raw

garlic.  *See id.* at 26-27.  Reiterating its finding in the underlying review that Excelink did

not pay "farmgate" prices, Commerce found that Excelink's prices included costs for

---

[13] Commerce did not make affirmative findings regarding the size of Mexican garlic relative to Chinese garlic; rather, Commerce emphasized Xinboda's failure to build a record from which it could make the findings urged by Xinboda.  *See* Remand Results at 21-22, 30.

processing the garlic,[14] off-site storage during the non-harvesting months, and transportation from the farmer to Excelink in the harvest season or from rented storage to Excelink in the non-harvesting months.  *Id.* at 26-27.  Accordingly, Commerce concluded that Romanian wholesale pricing data better reflected Xinboda's purchasing experience than Mexican farmgate prices.  *Id.* at 27, 30.  Commerce also rejected arguments that Romanian garlic prices are distorted by tariff quotas imposed by the European Union ("EU"), and that Mexican garlic prices are distorted by phytosanitary measures excluding Chinese garlic from Mexico.  *Id.* at 29, 30-31.

In view of these distinctions, Commerce selected Romania as the primary surrogate country, *id.* at 31, and used pricing data reported by the National Institute of Statistics Romania ("NISR") to value Xinboda's raw garlic, I&D Mem. at 13; Remand Results at 26-27.  Xinboda challenges Commerce's determination that Romania offered the best available information on the record, focusing on Commerce's findings regarding size, purchasing experience, and distortion in Romanian prices.  *See generally* Xinboda's Remand Opp'n.

From the outset, Xinboda misstates and misapplies the court's inquiry.  Xinboda insists that substantial evidence supports the use of Mexican data.  *See* Xinboda's Remand Opp'n at 1-18, 21-29, 31-32.  The court's inquiry, however, is whether substantial evidence supports Commerce's use of Romanian data; if so, such use will not be precluded even if substantial evidence also supports the use of Mexican data.

---

[14] Excelink's suppliers processed the garlic by "drying [it], cutting the root balls, cutting the stems, removing the dirt, bagging, and storing the garlic."  *Id.* at 27.

*See* 19 U.S.C. § 1516a(b)(1)(B)(i); *Matsushita Elec. Indus. Co. v. United States*, 750

F.2d 927, 933, 936 (Fed. Cir. 1984) (the possibility of drawing two inconsistent

conclusions from the evidence does not preclude the agency's finding from being

supported by substantial evidence).  Although Commerce's inquiry is directed to which

country offers the best available information, the court's inquiry is not the same.

Instead, the court considers whether substantial evidence supports the agency's

determination.  *See Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,* 652 F.3d

1333, 1341 (Fed. Cir. 2011) (the court is "not to evaluate whether the information

Commerce used was the best available, but [] whether a reasonable mind could

conclude that Commerce chose the best available information").  In so doing, the court

is conscious of its role not to "reweigh the evidence or [] reconsider questions of fact

anew."  *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed.

Cir. 2015) (quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube*

*AB*, 975 F.2d 807, 815 (Fed. Cir. 1992)).  Thus, if Commerce's determination is

"reasonable given the circumstances presented by the whole record," it will be

sustained.  *Changzhou Hawd Flooring Co., Ltd. v. United States*, 42 CIT ___, ___, 324

F. Supp. 3d 1317, 1321 (2018) (internal quotation marks and citations omitted).   The

court addresses Xinboda's specific contentions with the standard of review firmly in

mind.

### A.  The Comparability of Mexican Garlic to Chinese Garlic

Xinboda first contends that Commerce unreasonably accorded more weight to

Petitioners' articles discussing Romanian garlic than it did to Xinboda's articles

discussing Mexican garlic; the record contained more information establishing the size of Mexican garlic bulbs than it did establishing the size of Romanian garlic bulbs; and Commerce should have informed Xinboda that certain articles it previously accepted were unintelligible or insufficiently translated.  Xinboda's Remand Opp'n at 1-4. Defendant and Defendant-Intervenors contend that Commerce relied on the Romanian articles because Xinboda's articles were unintelligible, insufficiently translated, or otherwise failed to establish that Mexican garlic bulbs are more comparable to Chinese garlic bulbs.  Def.'s Remand Reply at 10-11; Def.-Ints.' Remand Reply at 7.

As noted, the burden of creating an adequate record before Commerce lies with interested parties.  *See QVD Food Co.*, 658 F.3d at 1324.  Although Commerce's regulations require parties to submit English translations of documents written in a foreign language, *see* Remand Results at 21 & n.100 (citing 19 C.F.R. § 351.303(e)), most of the information Xinboda submitted was either in Spanish or poorly translated using an online translation generator, *see id.* at 21-22 (explaining that, of the 68 pages submitted in the underlying administrative review and the additional 214 pages submitted on the record of the remand proceeding, just 16 pages were in English or legibly translated); Xinboda's Remand Opp'n at 3 (acknowledging that its use of an online translation generator resulted in overlapping text and mistranslated words).[15]

---

[15] Xinboda attributes its failure to properly translate the articles to the limited time allowed for the submission of rebuttal information.  Xinboda's Remand Opp'n at 4. However, the court notes that translation issues pervaded Xinboda's initial surrogate value submission, *see generally* Resubmission of Surrogate Value Submissions (Nov. 24, 2015) ("Xinboda's SV Submission"), Ex. SV-6, PR 387-89, PRJA Tab 6, indicating that this was not an isolated instance.  Xinboda's assertion that it "did not try to obtain

The two fully legible articles consisted of: (1) J.Z. Castellanos, et al., *Garlic Productivity and Profitability as Affected by Seed Clove Size, Planting Density and Planting Method*, 39 HortScience 1272 (2004) ("*Garlic Productivity and Profitability*"), *see* Remand Results at 21 n.99 (citing Xinboda's SV Submission, Ex. SV-6, ECF pp. 167-172);[16] Xinboda's Remand Rebuttal, Ex. 3, ECF pp. 289-194);[17] and (2) MC Macias Luis Martin Valdez et al., Guide to Cultivate Garlic in Aguascalientes: Producers Brochure No. 21 ("*Garlic in Aguascalientes*"), *see* Remand Results at 21 n.99 (citing Xinboda's Remand Rebuttal, Ex. 3, ECF pp.295-302).[18]

The deficient translations notwithstanding, Commerce addressed Xinboda's core arguments regarding the comparability of Mexican garlic to the subject merchandise. *See* Remand Results at 18 (referencing Xinboda's arguments regarding the relationship

---

more formal translations of the articles [submitted] in the original review because [Commerce] never said they were indiscernible" erroneously places the burden on Commerce to seek corrections to Xinboda's surrogate values submission. *See* Xinboda's Remand Opp'n at 4 n.4; 19 C.F.R. § 351.303(e). It also overlooks the fact that Commerce had no occasion to consider Xinboda's initial surrogate value submission because the agency did not then consider Mexico to be a potential surrogate country. *See* I&D Mem. at 7-8.

[16] For ease of reference, the court cites to the ECF page numbers stamped on the documents electronically filed with the court, rather than the PDF page numbers cited by the parties.

[17] *Garlic Productivity and Profitability* discusses "the influence of seed clove size, planting density and planting method on yield, bulb size and . . . profitability of [fresh] garlic." Xinboda's Remand Rebuttal, Ex. 3, ECF p. 289. The experiments discussed in the article relied solely upon the "Tacatzcaro" variety of garlic, and, as Commerce noted, relied on data from 1998 to 2000. *Id.*; Remand Results at 21 n.99.

[18] *Garlic in Aguascalientes* contains recommendations for garlic planting in the Aguascalientes region in terms of land considerations; garlic varieties; seeds; sowing; planting density; irrigation; fertilization; working the land; fighting weeds, pests, and diseases; and harvesting. Xinboda's Remand Rebuttal, Ex. 3, ECF pp. 295-301.

between Mexican commercial garlic classifications and bulb size); *id.* at 22-23

(addressing the arguments).   Commerce first explained that the "main table" discussing

garlic size specifications "that Xinboda refer[red] to [is] unintelligible," and appears to

reference an international standard.   *Id.* at 22 & n.104 (citing Xinboda's Remand

Rebuttal, Ex. 3, ECF p. 493).[19]   Although the translated table is partially legible, *see*

Xinboda's Remand Rebuttal, Ex. 3, ECF p. 493, it is contained in an article replete with

translation issues, *see id.*, ECF pp. 486-498.   More important, as Commerce noted, the

table's reference to international standards for garlic classification obviates its relevance

to the nature of Mexican garlic.   *See id.*, ECF p. 486.[20]   Even if the table reflected

Mexican garlic sizes, Xinboda has pointed to no record evidence to support its theory

that the number of size categories available are correlated to production volumes.   *See*

Xinboda's Remand Opp'n at 5-6 (asserting that the existence of several categories

above size 3 (i.e., sizes 4 to 12), applicable to garlic sized 35 millimeters ("mm") or

---

[19] The cited table contains a list of garlic size classifications ranging from 3 to 12, each of which corresponds to a bulb diameter size range.  *See id.*, ECF p. 493.

[20] It is true, as Xinboda asserts, that the phrase "norma Mexicana" appears in the original Spanish version in roughly the same place as the phrase "International Standard" appears in the English version; however, the reason for any discrepancy, if one exists, is unclear.  *See* Xinboda's Remand Opp'n at 6; *compare* Xinboda's Remand Rebuttal, Ex. 3, ECF p. 471, *with* Xinboda's Remand Rebuttal, Ex. 3, ECF p. 486.  The article's stated objective and concluding note refer to international and Mexican standards.  *See* Xinboda's Remand Rebuttal, Ex. 3, ECF pp. 486, 498.  Thus, the article appears to discuss some relationship between the international and Mexican standards for garlic classification; however, the poor quality of the translations prevent a clear understanding of the precise nature of the relationship for purposes of determining the article's relevance to the valuation of garlic in the underlying proceeding.

more), with just size 3 applicable to garlic sized less than 35 mm, demonstrates large bulb garlic production).

Commerce further explained that information regarding commercial classifications for garlic contained in *Garlic Productivity and Profitability* referred solely to the Tacatzcaro variety, and the record lacked evidence suggesting that Tacatzcaro garlic was sold in Mexico during the period of review or was "the main type of garlic produced and sold in Mexico."  Remand Results at 22 & n.105 (citing Xinboda's Remand Rebuttal, Ex. 3, ECF p. 289).  Xinboda asserts that the class numbers, commercial classifications, and bulb diameters nevertheless reflect Mexican garlic standards generally and "show that the majority of garlic grown and traded commercially is large bulb garlic."  Xinboda's Remand Opp'n at 7.  The relevant table lists seven categories of Tacatzcaro garlic,[21] ranging from 5 (bulb diameter of 40-45mm) to 11 (bulb diameter greater than 70mm).  *See* Xinboda's Remand Rebuttal, Ex. 3, ECF p. 289 (Table 1).  At most, the table suggests that Tacatzcaro garlic is generally large bulb, but, as Commerce noted, the table offered no indication regarding the volume of Tacatzcaro garlic sold in Mexico or the amount of Tacatzcaro garlic produced and sold in relation to Mexico's total garlic production.  *See* Remand Results at 22.

In contrast to Xinboda's evidence purporting to establish the size of Mexican garlic, the information Commerce relied upon to substantiate the size of Romanian garlic is legible and fully translated.  *See id.* at 23 & n.110 (citing I&D Mem. at 10);

---

[21] The article also refers to this variety as "Tacatzcuaro."  *See, e.g.*, *id.*, ECF p. 289.

Pet'rs' Rebuttal Comments on Surrogate Country Selection (June 11, 2015) ("Pet'rs'

Rebuttal SC Comments"), Ex. ROM-1, PR 191-94, PRJA Tab 5, Suppl. CRJA Tab 3,

Suppl. PRJA Tab 3.[22]  That the record contained more pages ostensibly about some

aspect of Mexican garlic than Romanian garlic is of no moment if Commerce cannot

read those pages, or most of the content therein.[23]

Xinboda's reliance on 19 U.S.C. § 1677m(d) also fails.   Section 1677m(d) states

the procedures Commerce must undertake in connection with deficient "response[s] to a

request for information."  19 U.S.C. § 1677m(d).[24]  Read in context, however,

---

[22] Commerce's Issues and Decision Memorandum quotes from Petitioners' summary of a publication discussing Romanian garlic that contains "a table of the most prominent varieties of garlic grown in Romania."  I&D Mem. at 10 & n.52 (quoting Pet'rs' Rebuttal SC Comments at 10).  Petitioners, in turn, cite to Exhibit ROM-1 appended to their submission.  *See* Pet'rs' Rebuttal SC Comments at 10.  Exhibit ROM-1 consists of an excerpt of a 2001 publication regarding the growing of vegetables in Romania.  *See id.*, Ex. ROM-1 (Nistor T Stan & Neculai C. Munteanu, Growing Vegetables Vol. II 80-86 (2001) ("*Growing Vegetables*")) (discussing the cultivation of "common garlic").  For the table listing the varieties of garlic cultivated in Romania, see Pet'rs' Rebuttal SC Comments, Ex. ROM-1, ECF p. 118.

[23] Xinboda's opposition to the Remand Results contains excerpts of the Spanish version of several tables listing garlic varieties and sizes with the English version of the heading appended thereto.  *See* Xinboda's Remand Opp'n at 5-11.  Further improving upon its translations provided to Commerce, Xinboda also excerpts portions of articles discussing Taiwanese and Perla garlic grown in Mexico.  *See* Xinboda's Remand Opp'n at 12; *cf.* Xinboda's Remand Rebuttal, Ex. 3, ECF p. 381.  As noted, however, it is not the court's role to reweigh the evidence or reconsider factual questions anew.  *See Downhole Pipe & Equip.*, 776 F.3d at 1377.

[24] Pursuant to section 1677m(d), if Commerce

determines that a response to a request for information under this subtitle does not comply with the request, [Commerce] shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews.

section 1677m(d) applies to a respondent's questionnaire responses, which are distinct

from the voluntary submission of surrogate value data.  *See Qingdao Sea-Line Trading*

*Co., Ltd. v. United States*, Slip Op 12-39, 2012 WL 990904, at *7 n.9 (CIT Mar. 21,

2012).[25]  Providing Xinboda with additional time to translate the articles would have

amounted to an extension of time for the submission of factual information that should

have been translated in the first instance.  *See* 19 C.F.R. § 351.303(e).

Xinboda next contends that Mexico's exports of fresh garlic to the United States

speaks to Mexico's production of large bulb garlic and cites several pieces of evidence

in support thereof.  Xinboda's Remand Opp'n at 13-15.  The Government dismisses this

argument, as Commerce did, on the basis that production levels and export amounts

---

19 U.S.C. § 1677m(d).  If the resubmission is also deficient or untimely, Commerce may "disregard all or part of the original and subsequent responses," subject to section 1677m(e).  *Id.* § 1677m(d)(1)-(2).  Section 1677m(e) states that Commerce may not "decline to consider information that is . . . necessary to the determination but does not meet all the applicable requirements" when the information is timely submitted; "the information can be verified"; "the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination"; the proponent of the information "has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce]"; and "the information can be used without undue difficulties."  *Id.* § 1677m(e)

[25] Although Commerce may *invite* surrogate value data through its setting of a deadline for that information, 19 C.F.R. § 351.301(c)(3), that is not the same as a response to a specific "request for information," *cf. id.* § 351.301(c)(1) (setting deadlines for the submission of factual information responsive to Commerce's questionnaires).  The language of 19 U.S.C. § 1677m(e) provides further support for interpreting § 1677m(d) as pertaining to questionnaire responses.  Although in a proceeding involving a nonmarket economy Commerce needs surrogate value data to establish normal value, *see* 19 U.S.C. § 1677b(c)(1), the surrogate value data proposed by a particular interested party is not "verified," and it is not "necessary to the determination" because Commerce may simply decide that other, non-deficient, surrogate information is the "best available," *id.* §§ 1677m(e), 1677b(c)(1).

are relevant to the significant producer analysis and, even then, the significance of

production is not judged against China's production levels.  Def.'s Remand Reply at 14;

Remand Results at 23.  Defendant-Intervenors contend that the size of exported garlic

bulbs "is not representative of the size of bulbs that are typically grown and harvested in

Mexico."  Def.-Ints.' Remand Reply at 9.

It is Commerce's province to weigh the evidence in the first instance, not the

court's.  *See POSCO v. United States*, 42 CIT ___, ___, 296 F. Supp. 3d 1320, 1349

(2018) (citing *Bowman Transp., Inc. v. Ark.–Best Freight System, Inc.*, 419 U.S. 281,

285–86 (1974)).  In view of Commerce's conclusory response to this argument, the

court's inquiry is whether the evidence upon which Xinboda relies undermines

Commerce's determination to render it unsupported by substantial evidence.  *See*

*Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1379 (Fed. Cir. 2003) (the court's

review must account for "the record as a whole, including evidence that supports as well

as evidence that fairly detracts from the substantiality of the evidence") (internal

quotation marks and citation omitted). [26]  The court concludes that Commerce's

determination is supported by substantial evidence.

---

[26] In connection with this argument Xinboda also seeks to respond to certain evidence
proffered by Petitioners in the underlying proceeding regarding the size of Mexican
garlic and Mexico's ability to meet U.S. demands for fresh garlic.  Xinboda's Remand
Opp'n at 14-15 & nn.7-8 (citations omitted).  Xinboda first faults Commerce for "plac[ing]
more weight on a privately obtained affidavit from a producer in Guanajuato state" than
the articles Xinboda provided, and for crediting certain information contained in the
affidavit.  *Id.* at 14 n.7 (citing Pet'rs' Remand Rebuttal, Attach. Decl.-1 (Decl. of Javier
Usabiaga González)).  Commerce's reference to the González Declaration was limited,
however, to the observation that it was on the record of the remand proceeding and that
the agency had relied on it in the subsequent administrative review of Chinese garlic.

Xinboda first points to an excerpted portion of a table contained in an article titled "Garlic Production [Chain]."  Xinboda's Remand Opp'n at 13 (citing Xinboda's Remand Rebuttal, Ex. 3, ECF p. 436 (Table 19)); *see also* Xinboda's Remand Rebuttal, Ex. 3, ECF pp. 418-50 (Manuel E. Well Spinosa et al., Foundation Produces [*sic*] Querétaro, Garlic Production Chain) ("*Garlic Production Chain*").  Although the table itself is legible, *Garlic Production Chain* as a whole is replete with mistranslations and other errors, *see* Xinboda's Remand Rebuttal, Ex. 3, ECF pp. 418-50.  Table 19 lists the sizes of Mexican garlic exported to the United States and Canada from 1999 to 2002, predating the period of review by roughly 11 years.  *See* Xinboda's Remand Rebuttal, Ex. 3, ECF p.436; *Final Results*, 81 Fed. Reg. at 39,897.  Xinboda excerpted only part of the table, however, listing Mexican exports of garlic sized giant, extra big, big, extra jumbo, jumbo, and super jumbo.  *See* Xinboda's Remand Opp'n at 13.  Xinboda omitted the part of the table listing Mexican exports of garlic sized unspecified, super colossal, little, colossal, and medium.  *See* Xinboda's Remand Rebuttal, Ex. 3, ECF p. 436.  The table does not

---

*See* Remand Results at 22 & nn.106-07 (citing, *inter alia*, Pet'rs' Remand Rebuttal, Attach. Decl.-1).  Commerce did not rely on the González Declaration in *this* segment of the proceeding.  *See* Remand Results at 22.  Xinboda also asserts that certain "Fresh Plaza" articles supplied by Petitioners concerning the Mexican garlic market are contradicted by other record evidence.  *See* Xinboda's Remand Opp'n at 14 & n.8 (citing, *inter alia*, Pet'rs' Remand Rebuttal, Attach. FP-1, FP-3, FP-4, and FP-5).  Again, Commerce noted Petitioners' placement of the Fresh Plaza articles on the record but did not rely on them to support specific findings.  *See* Remand Results at 15 & n.87. The court may not weigh the relative merits of Petitioners' and Xinboda's evidence in the first instance or sustain the agency's decision on any basis other than the one the agency itself articulated.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962); *POSCO*, 296 F. Supp. 3d at 1349 (citing *Bowman Transp., Inc.*, 419 U.S. at 285–86).  In view of these standards, the court does not further address Xinboda's challenges to these exhibits.

state the respective amounts of each garlic size exported.  *See id.*  Thus, at most, the

table indicates that, more than a decade ago, Mexico may have exported garlic in a

range of sizes to the United States and Canada.[27]

Xinboda's subsequent argument that Mexico is the largest supplier of garlic to

the United States after China is unsupported by the cited evidence.  *See* Xinboda's

Remand Opp'n at 15 (citing Xinboda's SC Comments, Ex. 2).  Xinboda's argument

regarding Mexico's supply of fresh garlic to the United States "when the Chinese and

domestic crop is out of season" is inapposite to the inquiry into Mexican garlic

production generally for purposes of assessing the quality of Mexican surrogate value

data.[28]  *See* Xinboda's Remand Opp'n at 15-16 (citing Pet'rs' Remand Rebuttal, Attach.

ITC-1 at I-11).  Thus, Xinboda's appeal to Mexican export data is unavailing.

Xinboda's final contention concerns Petitioners' arguments to Commerce

regarding dissimilarities between Mexico's and China's respective climates and

similarities between Romania's and China's respective climates.  Xinboda's Remand

Opp'n at 16-18.  Defendant and Defendant-Intervenors do not substantively respond to

---

[27] Xinboda also points to evidence regarding Mexico's consumption of fresh garlic, which Xinboda asserts requires higher quality garlic, to support the proposition that "Mexico grows large bulb garlic."  *See* Xinboda's Remand Opp'n at 13.  The assertion, however, fails to link Mexican consumption to large bulb garlic similar to the subject merchandise, particularly in light of evidence suggesting that Mexico grows a range of garlic sizes.  *See* Xinboda's Remand Rebuttal, Ex. 3, ECF p. 436 (Table 19).
[28] Xinboda also points to Mexico's supply of garlic to the United States prior to the initial 1994 investigation in the *Fresh Garlic from China* proceeding.  Xinboda's Remand Opp'n at 16 (citations omitted).  This information has minimal, if any, relevance to Commerce's surrogate country selection in the 2013-2014 administrative review at issue here.

Xinboda's climate-related discussion.  *See* Def.'s Remand Reply at 11, 14-15; Def.-Ints.'

Remand Reply at 6-10.

Commerce, for its part, noted Petitioners' arguments but did not rely on them.

*See* Remand Results at 15.  Xinboda's reliance on certain record evidence to draw

connections between Chinese and Mexican garlic growing climates nevertheless fails to

undermine Commerce's determination.  *See Nippon Steel*, 337 F.3d at 1379 (directing

the court to "review the record as a whole").  Xinboda fails to provide support for its

asserted linkage between garlic growing and the presence of a cold semi-arid climate.

*See* Xinboda's Remand Opp'n at 18.  Xinboda further fails to demonstrate that the

areas in Mexico exhibiting a cold semi-arid climate are the major garlic growing regions.

*Compare* Pet'rs' Remand Rebuttal, Attach. Climate-4 (listing Mexican regions with cold

semi-arid climates), *with* Xinboda's Remand Opp'n at 17 (listing major garlic growing

regions of Mexico) (citing Xinboda's Remand Rebuttal, Ex. 2).

Xinboda's arguments regarding the comparability of Mexican garlic to the subject

merchandise do not undermine Commerce's reliance on Romanian data because

Commerce addressed these arguments to the extent that they were relevant and

supported by legible record evidence, and Xinboda's arguments do not detract from the

substantial evidence concerning Romanian garlic size on which Commerce relied.

### B.  The Comparability of Romanian Garlic to Chinese Garlic

Xinboda challenges Commerce's reliance on the weight of Romanian garlic as

set forth in *Growing Vegetables* to draw conclusions about the Romanian garlic size.

*See* Xinboda's Remand Opp'n at 18.  Xinboda contends that Commerce impermissibly

relied on a 2012 online advertisement from a Chinese exporter to establish a weight-to-size ratio because the advertisement is outdated and "from a little known exporter." *Id.* at 19.  Xinboda further contends that *Growing Vegetables* relies on 1998 data and fails to establish country-wide production of large bulb garlic.  *See id.* at 20.  Xinboda also contends that Romanian yield size suggests that Romanian garlic is generally not large bulb.  *Id.* at 20.

Defendant contends that Commerce's choice between "two imperfect options"—poorly translated or illegible Mexican data and a "single, dated article" requiring a "straightforward inference with respect to a correlated ratio"—is left to the agency's discretion.  Def.'s Remand Reply at 10 (citation omitted).  Defendant-Intervenors contend that the "conversion of bulb weights . . . to diameters required only a simple calculation," and Xinboda points to no evidence contradicting Commerce's conversion.  Def.-Ints.' Remand Reply at 10-11.

The *Growing Vegetables* article upon which Commerce relied to substantiate the size of Romanian garlic contains a table listing the types of garlic cultivated in Romania.  *See* Remand Results at 30 & n.126 (citing I&D Mem. at 10); I&D Mem. at 10 & n.52 (citing Pet'rs' Rebuttal SC Comments at 10); Pet'rs' Rebuttal SC Comments at 10 (citing Pet'rs' Rebuttal SC Comments, Attach. ROM-1).  In the spring, those varieties are medium-sized and weigh 20 to 30 grams.  *See* Pet'rs' Rebuttal SC Comments, Attach. ROM-1, ECF p. 118.  In the fall, Romanian garlic consists of one medium-sized variety weighing 25 to 35 grams, and two large-sized varieties weighing 40 to 50 grams and 40 to 60 grams, respectively.  *See id.*

To convert weight to size, Commerce used an advertisement from an online marketplace regarding the sale of a 250-gram bag of fresh garlic consisting of four bulbs with 60-centimeter ("cm") diameters.  *See* Remand Results at 23-24; Pet'rs' Rebuttal SC Comments, Attach. PRC-1, ECF p. 153.  As Commerce explained, the advertisement can "be used to calculate a general weight ratio[:] . . . 250 grams/4 bulbs = 62.5 grams per bulb," Remand Results at 24; i.e., about one gram per centimeter of the diameter.  Absent alternative information on the record, the advertisement was the best available for Commerce to use and Xinboda points to nothing to suggest the conversion is unreasonable.

Xinboda's arguments regarding Romanian garlic size and yield size also fail. Chinese garlic ranges in size from about 1 ½ to 2 ½ inches in diameter, *See* Decision Mem. for the Prelim. Results of the 2013-2014 Antidumping Duty Admin. Review at 22 & nn.137-38 (citations omitted), PR 398, CJA Tab 51, PJA Tab 51, the equivalent of about 3.81cm to 6.35cm in diameter.  Applying the weight to size ratio of one gram per centimeter of diameter shows that two of the fall garlic varieties are within the size range of the subject merchandise.  *See* Pet'rs' Rebuttal SC Comments, Attach. ROM-1, ECF p. 118.  As to yield, record evidence demonstrates that Romanian garlic output can range from 5-6 metric tons ("MT") per hectare to 10-12 MT per hectare, indicating the potential for Romanian garlic to be weighted to the larger varieties in the *Growing Vegetables* table.  *See id.*, Attach. ROM-1, ECF p. 120.  In sum, Commerce found evidence of large bulb garlic production in Romania, and the record supports that finding.

### C.  Level of Trade

Xinboda contends that Commerce erred in relying on Romanian wholesale prices to value its garlic because Xinboda purchases garlic on a farmgate basis, and the Mexican pricing data consists of what Xinboda considers to be farmgate prices.  *See* Xinboda's Remand Opp'n at 21-29.  Xinboda further contends that Commerce's selection of a wholesale price is inconsistent with the agency's practice in prior administrative reviews.  *Id.* at 24.  Defendant and Defendant-Intervenors contend that this record supports Commerce's determination that Xinboda's garlic price contains post-harvesting charges that are not indicative of farmgate prices.  Def.'s Remand Reply at 16-18; Def.-Ints.' Remand Reply at 12-15.

Commerce defined the term "farmgate" as "the purchase price of raw garlic as it is harvested with no further processing or handling, and including no additional charges . . . . [I]t is garlic, immediately following harvest, that has not been sorted, cleaned, processed, stored, transported or in any other way handled or modified."  Remand Results at 26 & n.115 (citation omitted).  Commerce examined the input for which it was seeking a surrogate value and determined that Xinboda's processor, Excelink, was not making farmgate purchases as Commerce defined the term.  *See id.* at 26-27 & nn.118-19 (discussing evidence of post-harvest processing, rented cold-storage, and transportation) (citing Suppl. Questionnaire Resp.—Shenzen Xinboda (Sept. 1, 2015) at 4, CR 137-45, PR 304-05, PRJA Tab 7, Suppl. CRJA Tab 4, Suppl. PRJA Tab 4; Second Suppl. Questionnaire Resp.—Shenzhen Xinboda (Nov. 3, 2015) at 3-5, CR 163, PR 365, PRJA Tab 8, Suppl. CRJA Tab 5, Suppl. PRJA Tab 5).  Taking this

evidence into consideration along with Commerce's use of the intermediate input

methodology, Commerce determined that the Romanian pricing data was more

comparable than Mexican pricing data.  Remand Results at 27; *see also* I&D Mem. at

28-29 (discussing the intermediate input methodology by which Commerce seeks a

surrogate value for the price of fresh garlic rather than the factors of production used in

producing fresh garlic).  Commerce noted that in selecting surrogate values it need not

"match the respondent's exact production experience."  Remand Results at 27 & n.120

(citing I&D Mem. at 16; *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377

(Fed. Cir. 1999)).  In other words, the surrogate value need not be perfect.  Here, while

neither the farmgate prices, as Commerce accepted the Mexican pricing data to be, nor

the wholesale prices, as Commerce understood the Romanian data to be, may

precisely describe the stage of distribution at which Excelink purchases garlic,

Commerce's decision to select Romanian wholesale pricing data, which includes certain

post-harvesting and storage costs, is supported by substantial evidence.  Xinboda's

arguments to the contrary are unavailing.

     To support the assertion that Excelink purchased garlic on a farmgate basis,

Xinboda relies on a different understanding of the term that allows for the inclusion of

some processing or storage costs.  *See* Xinboda's Remand Opp'n at 27 (citations

omitted).  Commerce's definition, however, is reasonable and consistent with the

definition Commerce used in prior administrative reviews.  *See* Issues and Decision

Mem. for the Final Results and Rescission, in Part, of the Antidumping Duty Admin.

Review of Fresh Garlic from the People's Republic of China, A-570-831 (June 10, 2013)

("AR 17 Decision Mem.") at 14 n.56, *available at* https://enforcement.trade.gov/frn/

summary/prc/2013-14329-1.pdf (last visited Dec. 18, 2018); Issues and Decision Mem.

for Fresh Garlic from the People's Republic of China: Final Results of the 2009-2010

Admin. Review, A-570-831 (June 4, 2012) ("AR 16 Decision Mem.") at 19-20, *available*

*at* https://enforcement.trade.gov/frn/summary/prc/2012-14152-1.pdf (last visited Dec.

18, 2018).

     Specifically, Xinboda points to Commerce's successful defense of its selection of

farmgate prices in the 17th administrate review as "the law of the case" requiring

Commerce to use farmgate prices in this review.  Xinboda's Remand Opp'n at 25.

However, the law of the case doctrine applies to issues that have previously been

resolved.  *See Intergraph Corp. v. Intel Cor*p., 253 F.3d 695, 697 (Fed. Cir. 2001)

("[L]aw of the case doctrine 'expresses the practice of courts generally to refuse to

reopen what has been decided.'") (quoting *Messenger v. Anderson,* 225 U.S. 436, 444

(1912)).  Commerce's selection of pricing data to value Xinboda's raw garlic purchases

in *this* period of review has *not* previously been resolved; thus, the law of the case

doctrine is inapposite.  Further, Commerce's decision in the 17th administrate review

illustrates why Commerce may reach different conclusions in separate administrative

reviews based on different record facts.  *See generally Jiaxing Brother Fastener Co.,*

*Ltd.*, 822 F.3d at 1299 ("each administrative review is a separate exercise of

Commerce's authority that allows for different conclusions based on different facts in the

record") (citation omitted).  In the 17th administrative review, while Commerce selected a

farmgate-approximate price over a price resembling a wholesale price, the agency

similarly discussed the fact that Xinboda's garlic was not obtained at farmgate prices, but, as here, included some post-harvest processing.  Taking that into consideration, in relation to the surrogate values placed on that record (including the Azadpur sales prices from India, which are not at issue in this review) Commerce made its record-specific determination.  AR 17 Decision Mem. at 14-23.

There is one aspect of Commerce's determination, however, that requires further consideration by the agency.  In the underlying proceeding, Commerce added transportation costs to the Romanian wholesale prices to account for delivery of the raw garlic "from the farmer or storage facility to Excelink."   *See* I&D Mem. at 29 & n.174 (citation omitted).  Information placed on the record of the remand proceeding suggests that NISR prices "likely include any *transportation costs*, storage costs, processing or packaging costs, and a profit mark-up."   Xinboda Remand Rebuttal, Ex. 4, ECF p. 523 (emphasis added).  Thus, while the court sustains Commerce's determination that Romanian prices are more comparable to Excelink's purchasing experience, a remand is required for Commerce to clarify its justification for adding transportation costs to the wholesale prices.

### D.  Distortion in the Romanian Garlic Market

Xinboda contends that a garlic tariff quota imposed on Chinese garlic imported into Romania after Romania joined the EU in 2007 has distorted Romanian garlic prices.  Xinboda's Remand Opp'n at 29-30.  Defendant and Defendant-Intervenors contend that Commerce correctly declined to infer that the price increases after Romania joined the EU in 2007 resulted *either* from a tariff quota (as Xinboda had

asserted) or from "the removal of unfairly traded garlic imports" (as Petitioners had asserted).  Def.'s Remand Reply at 18-19; Def.-Ints.' Remand Reply at 15-16.

On this issue, Commerce explained that the record failed to demonstrate that EU-imposed tariff quotas distorted or otherwise increased Romanian garlic prices.  I&D Mem. at 14; *see also* Remand Results at 29 & n.124 (citing I&D Mem. at 11-14).  According to Commerce, at most, Xinboda had demonstrated "a temporal correlation" between Romania's accession to the EU and increased prices, not causation.  I&D Mem. at 14.  Commerce faulted Xinboda for "presum[ing] that such a relationship exist[ed]" absent evidence "quantifying such a relationship."  *Id*.

Before the court, Xinboda surmises that "[t]he tariff quota is the only reasonable explanation for the sustained price increase."  Xinboda's Remand Opp'n at 30.  Upon review of the entirety of the record, substantial evidence supports Commerce's decision not to infer the existence of such a relationship.  *See Nippon Steel*, 337 F.3d at 1379.

As of April 1, 2007, the EU imposed tariff quotas on imports of fresh garlic from China, Argentina, and other third countries.  *See* Rebuttal Final Surrogate Value Submission (Nov. 12, 2015), Ex. SV-2, ECF pp. 419, 426, PR 371, CJA Tab 42, PJA Tab 42.  Pursuant thereto, the first 33,700 MT of garlic imported into the EU from China was subject only to a 9.6 percent *ad valorem* duty; thereafter, any additional garlic was subject to the 9.6 percent *ad valorem* duty plus an additional duty of 1,200 Euros per MT.  *See id.*, ECF pp. 419, 425-26 (further providing for tariff quotas of 19,147 MT on garlic imports from Argentina and 6,023 MT on garlic imports from other third countries).  In 2014, the tariff quota applicable to China increased to 46,075 MT, while the tariff

quotas applicable to Argentina and other third countries remained the same, thereby

increasing the quantity of garlic that could be imported into the EU at 9.6 percent duties

to more than 70,000 MT.  *Id.*, ECF p. 436.  In 2007, EU countries collectively imported

between 60,000 and 80,000 MT of fresh garlic from other countries, with between

30,000 and 40,000 MT originating in China.  *Id.*, ECF p. 419.  However, Xinboda

provided no evidence indicating that the volume of fresh garlic imported into the EU

increased between 2007 and 2014; thus, it is speculative to assume that the above-

quota duty had any effect on import quantities, let alone pricing within the EU generally,

or Romania specifically, during the period of review.

     In light of record evidence indicating that most, if not all, of the fresh garlic

imported into the EU was *not* subject to the additional duty of 1,200 Euros, substantial

evidence supports Commerce's decision not to infer a causal relationship between EU-

imposed tariff quotas and increased Romanian garlic prices.  *See* Remand Results at

29; I&D Mem. at 14.

     In sum, Commerce's determination that Romanian data better fulfilled the

contemporaneity and product-specificity criteria of its factors data analysis is supported

by substantial evidence.   Accordingly, notwithstanding the need to address the addition

of transportation costs to Romanian pricing date, Commerce's selection of Romania as

the primary surrogate country is sustained.

## II.  Movement Expenses

     For the *Final Results*, Commerce relied on information contained in the World

Bank's *Doing Business 2015: Romania* ("*Doing Business Romania*") report to calculate

a surrogate value for brokerage and handling and inland truck freight pursuant to 19

U.S.C. § 1677a(c)(2)(A).  I&D Mem. at 30-31; *see also* Pet'rs' Surrogate Value

Comments (June 17, 2015) ("Pet'rs' SV Comments"), Ex. 6, PR 275-80, CJA Tab 26,

PJA Tab 26 (copy of the report).  Specifically, Commerce "calculated a per kilogram

brokerage and handling and inland freight [cost] using the price data to export

standardized cargo of ten metric tons in a standard 20-foot container as published in

*Doing Business Romania*."  I&D Mem. at 31.  In other words, Commerce used the costs

reported in *Doing Business Romania* as the numerator in the equation with a payload

weight of 10,000kg (ten MT) as the denominator.  *See* Surrogate Values for the Prelim.

Results (Nov. 30, 2015) ("Prelim. SV Mem."), Exs. 8, 9, PR 401-02, CJA Tab 53, PJA

Tab 53.  The calculation of inland freight required additional inquiry into the distance

traveled (i.e., cost of inland transportation and handling per kilogram per kilometer).

*See id.*, Ex. 8.  According to Commerce, "the container payload weight of 10,000kg [is]

explicitly stated in the *Doing Business* methodology," and "is one of the assumptions in

all *Doing Business* reports."  I&D Mem. at 30 & n.184 (citing Pet'rs' SV Comments, Ex.

6).

Xinboda challenges Commerce's use of the 10,000kg denominator.  *See*

Xinboda's 56.2 Br. at 32-35.  Though apparently accepting the 10,000kg denominator

weight as an assumption of the report, Xinboda contends that "does not infer that the . .

. weight of the container is the basis of the cost."  *Id.* at 32.  According to Xinboda,

record evidence demonstrates that brokerage and handling fees "are based on an entire

container and not the weight of its contents."  *Id.* at 33.  Xinboda contends that

Commerce should, therefore, replace the 10,000kg denominator with "the maximum

weight of a container or the average weight of Xinboda's containers."  *Id.* at 35; *see also*

Pl. Shenzhen Xinboda Indus. Co., Ltd. Reply Br. ("Xinboda's 56.2 Reply") at 18-20, ECF

No. 53.

Defendant contends that Commerce's calculations are correct because *Doing*

*Business Romania* provides data relevant to a "standard shipment of goods," which is "a

dry-cargo, 20-foot-full container load" that is "assumed to weigh 10,000kg."  Confidential

Def.'s Resp. to Consol. Pls.' Mots. for J. Upon the Agency R. ("Def.'s 56.2 Resp.") at 53-

54, ECF No. 47 (citing Pet'rs' SV Comments, Ex. 6 at 2, 69).  Defendant-Intervenors

similarly contend that because "World Bank survey [respondents] are asked to assume

that the payload weight is 10,000kg, the reported costs are based on this assumption"

and using a different denominator "would distort the costs."  Confidential Def.-Ints.'

Resp. in Opp'n to Pls.' Mots. for J. on the Agency R. ("Def.-Ints.' 56.2 Resp.") at 46,

ECF No. 46.

Before addressing Xinboda's arguments for alternative denominators, the court

must begin by assessing whether Commerce's decision to apply a 10,000kg

denominator is supported by substantial evidence and in accordance with law.  It is not.

In the Issues and Decision Memorandum, Commerce quoted extensively from its

determination in *Certain Nails from the People's Republic of China* as support for its use

of the 10,000kg denominator.  I&D Mem. at 31 & n.187 (quoting *Certain Nails from the*

*People's Republic of China*, 78 Fed. Reg. 16,651 (Dep't Commerce Mar. 18, 2013)

(final results of third antidumping duty admin. review; 2010-2011).  The decision

memorandum accompanying that determination notes that Commerce calculated

brokerage and handling using data supplied by a *Doing Business* report on Thailand.

*See* Certain Steel Nails from the People's Republic of China: Issues and Decision Mem.

for the Final Results of the Third Antidumping Duty Admin. Review, A-570-909 (Mar. 5,

2013) at 34, *available at* https://enforcement.trade.gov/frn/summary/prc/2013-06173-

1.pdf (last visited Dec. 18, 2018).  Therein, Commerce explained that it calculated

brokerage and handling "by dividing the total charge by 10 tons which is found under

'Trading Across Borders Methodology: Assumptions about the Business,'" which states,

"The traded product travels in a dry cargo, 20 foot, full container load.  *It weighs 10

tons*."  *Id.* at 34 (emphasis added).

Here, however, the *Doing Business Romania* report Commerce relied upon

merely assumes the presence of "a dry-cargo, 20-foot-*full* container load," Pet'rs' SV

Comments, Ex. 6 at 69 (emphasis added); it does not provide *any* assumption regarding

the container's weight, *see id.*  Commerce's assertion that the 10,000kg payload weight

is "*explicitly* stated in the *Doing Business* methodology" is, simply, incorrect, I&D Mem.

at 30 (citing Pet'rs' SV Comments, Ex. 6) (emphasis added), and Commerce's assertion

that a 10,000kg payload weight "is one of the assumptions in all *Doing Business*

reports" is unsupported by the record, *see id.* (emphasis added).

Shipping information supplied by Xinboda suggests that weight or volume is

taken into consideration only when shipping less than full container loads.  *See* Prelim.

Surrogate Values Submission (June 17, 2015), Ex. SV-21, ECF pp.60, 70-72, PR 281-

85, CJA Tab 27, PJA Tab 27 (international freight forwarders offering rates based solely

on the size of the container irrespective of weight); *id.*, Ex. SV-21, ECF pp.61-66

(distinguishing between full container loads (which are based on container size) and

less than full container loads (which are based on weight or volume)).[29]  While the

record therefore supports the inference that the costs reported in *Doing Business*

*Romania* reflect the cost of shipping full container loads, the record does not support the

inference that those costs are based on a 10,000kg payload weight.  *See* I&D Mem. at

30.[30]  Although Commerce must identify a suitable denominator to calculate Xinboda's

movement expenses on a per unit basis, without more, Commerce's use of a 10,000kg

denominator is arbitrary.[31]  *See Changzhou Wujin Fine Chemical Factory Co., Ltd. v.*

*United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (providing for review of

Commerce's reasoning pursuant to "the arbitrary and capricious (or contrary to law)

standard") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S.

---

[29] Defendant-Intervenors' attempt to dismiss Xinboda's evidence by pointing to references to rates based on size or weight misses the mark because that information pertains to less than full container loads.  *See* Def.-Ints.' 56.2 Resp. at 45 (citing Xinboda's Prelim. SVs, Ex. SV-21, ECF p. 61); Pet'rs' SV Comments, Ex. 6 at 69.

[30] Defendant's assertion that Xinboda has failed to support the use of different denominator weights that "are not mentioned in the *Doing Business [Romania]* report," Def.'s 56.2 Resp. at 56, cannot prevail because the 10,000kg container weight assumption is also not stated in the report.

[31] Commerce summarily asserted that 10,000kg "is a mid-point between the smallest and the greatest weight held in a 20-foot container, which provides reasonable as well as consistent reporting across commodities."  I&D Mem. at 31.  Assuming a smallest weight of zero (an empty container), and a greatest weight of 28,200kg, *see* Case Br. (Jan. 19, 2016) at 56 n.15, CR 183, PR 419, CJA Tab 56, PJA Tab 56 (citation omitted), 10,000kg is clearly not the mid-point.

29, 48–49 (1983)).[32]  Accordingly, this issue is remanded to the agency for further

consideration.[33]

### CONCLUSION & ORDER

In accordance with the foregoing, it is hereby

ORDERED that Commerce's Remand Results are sustained with respect to

Commerce's selection of Romania as the primary surrogate country and selection of

Romanian pricing data as the surrogate value for raw garlic, as set forth in Discussion

Section I; and it is further

ORDERED that Commerce's Remand Results are remanded with respect to

Commerce's addition of transportation costs to the surrogate value for raw garlic, as set

forth in Discussion Section I.C; and it is further

---

[32] Parties dispute the applicability of the court's decision in *Since Hardware (Guangzhou) Co., Ltd. v. United States*, 38 CIT ___, ___, 977 F. Supp. 2d 1347, 1361 (2014), *vacated in part*, 38 CIT ___, 37 F. Supp. 3d 1354 (2014), *aff'd*, 636 F. App'x. 800 (Mem) (Fed. Cir. 2016).  *See* Xinboda's 56.2 Br. at 33-34; Xinboda's 56.2 Reply at 19-20; Def.'s 56.2 Resp. at 56; Def.-Ints.' 56.2 Resp. at 45-46.  While the precise issue confronting the *Since Hardware* court differs from the issue confronting the court in this case, the *Since Hardware* opinion is instructive in its observation that costs provided pursuant to a *Doing Business* parameter regarding container size should not be construed as necessarily bearing any relationship to the weight of product in the container, 977 F. Supp. 2d at 1361-62, and it generally supports the court's finding herein that Commerce must point to record evidence to support its chosen denominator. The court will, however, leave it to Commerce on remand to identify a suitable denominator that has support in the record and to explain its reasons for that choice.
[33] On remand, Xinboda is free to renew its arguments regarding alternative denominators.

**ORDERED** that Commerce's *Final Results* are remanded with respect to Commerce's calculation of Xinboda's movement expenses as set forth in Discussion Section II; and it is further

**ORDERED** that, in the event Commerce amends the antidumping margin assigned to Xinboda, Commerce reconsider the separate rate assigned to non-mandatory respondents; and it is further

**ORDERED** that Commerce shall file its remand results on or before April 2, 2019; and it is further

**ORDERED** that the deadlines provided in USCIT Rule 56.2(h) shall govern thereafter; and it is further

**ORDERED** that any opposition or supportive comments must not exceed 5,000 words.


                                                    /s/      Mark A. Barnett
                                                    Mark A. Barnett, Judge

Dated:   December 26, 2018
          New York, New York